(October 1, 1910.)

In the Matter of the Application of EDGAR M. HEIGHO for a Writ of Habeas Corpus.

[110 Pac. 1029.]

MANSLAUGHTER—CAUSE OF DEATH—FRIGHT AND NERVOUS SHOCK.

(Syllabus by the court.)

1. Under the provisions of sec. 6565, Rev. Codes, "involuntary manslaughter is defined to be "The unlawful killing of a human being in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

2.　Under the statute of this state, sec. 6565, Rev. Codes, an unlawful killing, though unintentional and involuntary, if accomplished by one while engaged in the commission of an unlawful act, is manslaughter, and the statute does not circumscribe the means or agency causing the death. This statute covers and includes any and all means and mediums by or through which a death is caused by one engaged in an unlawful act.

3.　Under the statute of this state, sec. 6565, Rev. Codes, a prosecution for manslaughter may be had where the death of a human being has been caused or accomplished through fright, fear, terror or nervous shock produced by the accused while in the commission of an unlawful act, even though the accused made no hostile demonstration and directed no overt act at the person of the deceased. It would seem that in some instances force or violence may be applied to the mind or nervous system as effectually as to the body.

Original application for writ of *habeas corpus*. Writ issued and hearing had on return thereto. Writ quashed and prisoner remanded to the custody of the officer.

Harris & ·Smith, and N. M. Ruick, for Petitioner.

It is incumbent upon the state to show that there is such a relation between this act of the accused and the death of Mrs. Riegleman as to prove beyond reasonable doubt that such act was the exact cause of her death. (21 Am. & Eng. Enc. of Law, 97 (c).)

A person must be presumed to do that which he voluntarily and wilfully does in fact do, and that he intends all the natural, probable and usual consequences of his acts (*Commonwealth v. Webster,* 5 Cush. 305, 52 Am. Dec. 711; *People v. Munn,* 65 Cal. 211, 3 Pac. 650), but not all the *possible* ·consequences of his act. (*People v. Munn, supra; People v. Rockwell,* 39 Mich. 503.)

Counsel, after a protracted and careful search, have failed to discover in the books a single case presenting the same precise facts as are here presented. The only cases that approach anywhere near are those cited in note 4, p. 98, 21 Am. & Eng. Enc. of Law.

J. L. Richards, Prosecuting Attorney of Washington County, B. S. Varian, and Hawley, Puckett & Hawley, for the State.

A person is responsible for a homicide in whatever manner or by whatever means the death was caused, provided it was caused by his unlawful act or omission resulting in physical or corporal injury. (21 Cyc. of Law & Prac. 694, 695, and authorities cited.)

A person may be guilty of murder or manslaughter, according to the circumstances, if by reason of fright, intentionally and unlawfully caused by him, physical or corporeal injury and death resulted. (*Thornton v. State,* 107 Ga. 683, 33 S. E. 673; *Adams v. People,* 109 Ill. 444, 50 Am. Rep. 617; *Hendrickson v. Commonwealth,* 85 Ky. 281, 7 Am. St. 596, 3 S. W. 166; *Cox v. People,* 80 N. Y. 500; *Hopkins v. Commonwealth,* 117 Ky. 941, 80 S. W. 156, 4 Ann. Cas. 958, and authorities cited in note.)

A person will not be permitted to do an act which jeopardizes the life and safety of another, and then upon the plea of accident escape liability for a homicide involuntarily resulting from his recklessness. (*Potter v. State,* 162 Ind. 213, 102 Am. St. 198, 70 N. E. 129, 64 L. R. A. 942, 1 Ann. Cas. 32; 21 Am. & Eng. En. of Law, 98, 191, and authorities cited; Stephen, Digest Cr. Law, art. 221; *People v. Stubenvall,* 62 Mich. 329, 28 N. W. 883.)

The unintentional killing of a person through the negligent handling of a firearm in any way indicating a disregard of human life is manslaughter. (*State v. Grote,* 109 Mo. 345, 19 S. W. 93; *State v. Emory,* 78 Mo. 77, 47 Am. Rep. 92; *People v. Fuller,* 2 Parker Crim. Rep. (N. Y.) 16; *State v. Vines,* 93 N. C. 493, 53 Am. Rep. 466; *Sparks v. Commonwealth,* 3 Bush (Ky.), 111, 96 Am. Dec. 196; *Pool v. State,* 87 Ga. 526, 13 S. E. 556.)

AILSHIE, J.—Petitioner was held by the probate judge of Washington county to answer the charge of manslaughter, and has applied to this court for his discharge on the ground that

the facts of the case do not disclose the commission of a public offense. The evidence produced at the preliminary examination has been attached to the petition. This court cannot weigh the evidence on *habeas corpus,* but if it wholly fails to disclose a public offense for which a prisoner may be held on preliminary examination, then the petitioner would be entitled to his discharge. (*In re Knudtson,* 10 Ida. 676, 79 Pac. 641.)

The facts disclosed by the evidence are in substance as follows: On the 4th day of August, 1910, at Weiser, Washington county, the petitioner, Edgar M. Heigho, hearing that one J. W. Barton had made remarks derogatory to petitioner's character, called one of his employees, Frank Miller, and requested him to accompany petitioner to the residence of Barton. Heigho and Miller went to Barton's residence about 7 o'clock in the evening, ascended the front porch and Heigho rang the door-bell. Mrs. Sylvia Riegleman, the mother in law of Barton, was living at the Barton residence and was in a bedroom at the front of the house, and immediately off from and adjoining the reception-room or hallway at the time the door-bell rang. Barton responded to the call, and as he passed through the front room and was about to open the front door, Mrs. Riegleman, who was then near him, exclaimed, "Oh, he has a gun." Barton stepped out at the door and found Heigho standing on the front porch with a gun, commonly called a revolver or pistol, hanging in a holster or scabbard, which was strapped about his body. Miller stood by the side of Heigho. Heigho asked Barton some questions as to the statements Barton had been making about him, and upon Barton asserting that he had not told anything that was not true or not common talk in the town, Heigho struck him in the face with his fist and Barton staggered back and fell into the wire netting on the screen door. Barton did not rise for a few seconds, and in the meanwhile his wife came and assisted him to arise. Heigho and Miller backed off the porch and stood in front of the doorway. Barton advanced on Heigho and struck him a couple of blows, whereupon they clinched and the wife interfered and separated them and or-

dered Heigho and Miller off the premises. Mrs. Riegleman was at this time at the door crying, and had been heard to say a time or two, "He will kill you" or "He has a gun." Barton and wife immediately mounted the porch where Mrs. Riegleman was on her knees resting against or over the banister, apparently unable to rise. She remarked to Barton that she was dying and again repeated something about "him having a gun." She began spitting a bloody froth and rattling in the chest. A physician was called and was unable to give her any relief, and she died inside of about thirty minutes from the time of the appearance of Heigho on the front porch. The physician who attended her made a *post mortem* examination, and testified that she had an aneurism of the ascending aorta and this had ruptured into the superior vena cava and caused her death. He said that excitement was one of three principal causes that will produce such a result. Heigho was thereafter arrested on the charge of manslaughter in causing the death of Mrs. Riegleman by terror and fright while he was engaged in the commission of an unlawful act not amounting to felony.

We are now asked to determine whether under the statute of this state a person can be held for manslaughter where death was caused by fright, fear or nervous shock and where the prisoner made no assault or demonstration against the deceased, and neither offered nor threatened any physical force or violence toward the person of the deceased.

In the early history of the common law, a homicide to be criminal must have resulted from corporal injury. Fright, fear, nervous shock or producing mental disturbance, it was said, could never be the basis of a prosecution for homicide. East, in his Pleas of the Crown, c. 5, sec. 13, says: "Working upon the fancy of another or treating him harshly or unkindly, by which he dies of grief or fear, is not such a killing as the law takes notice of." An examination of the ancient English authorities fully corroborates and establishes this to have been the early English rule. (1 Hale P. C. 425–429; Steph. Dig. Cr. Law, art. 221.) This rule appears, however, to have been gradually modified and greatly

relaxed in modern times by most of the English courts. So in later years we find the court holding a prisoner for manslaughter where his conduct toward his wife caused her death from shock to her nervous system. (*Reg. v. Murton,* 3 F. & F. 492.)

And in *Reg. v. Dugal,* 4 Quebec, 492, the Canadian court held the prisoner guilty of manslaughter, where with violent words and menaces he had brandished a table knife over his father and the latter became greatly agitated and weakened from the fright and died in twenty minutes thereafter of syncope.

In *Regina v. Towers,* 12 Cox's C. C. 530, decided in 1874, the defendant struck a twelve year old girl, who was holding a small child in her arms, and the child became frightened and went into convulsions and lingered for about six weeks and died, and the court held the facts sufficient to go to the jury on a charge of manslaughter. That is the only reported case that counsel have cited or we have been able to find where death resulted from fright, and the cause of fright had not been directed by the accused at the deceased but had, on the contrary, been directed at some third party. That case is, in principle, so nearly parallel with the one at bar that we quote at length from the opinion. Justice Denman said that ''he should leave it to the jury to say whether the death of the child was caused by the unlawful act of the prisoner, or whether it was not so indirect as to be in the nature of accident. This case was different from other cases of manslaughter, for here the child was not a rational agent, and it was so connected with the girl that an injury to the girl became almost in itself an injury to the child. . . . . It might be that in this case, unusual as it was, on the principle of common law, manslaughter had been committed by the prisoner. The prisoner committed an assault on the girl, which is an unlawful act, and if that act, in their judgment, caused the death of the child, i. e., that the child would not have died but for that assault, they might find the prisoner guilty of manslaughter. He called their attention to some considerations that bore some analogy to this case. This was

one of the new cases to which they had to apply old principles of law. It was a great advantage that it was to be settled by a jury and not by a judge. If he were to say, as a conclusion of law, that murder could not have been caused by such an act as this, he might have been laying down a dangerous precedent for the future; for, to commit a murder, a man might do the very same thing this man had done. They could not commit murder upon a grown-up person by using language so strong, or so violent, as to cause that person to die. Therefore, mere intimidation, causing a person to die from fright by working upon his fancy, was not murder. But there were cases in which intimidations had been held to be murder. If, for instance, four or five persons were to stand round a man, and so threaten him and frighten him as to make him believe that his life was in danger, and he were to back away from them and tumble over a precipice to avoid them, then murder would have been committed. Then did, or did not, this principle of law apply to the case of a child of such tender years as the child in question? For the purposes of the case, he would assume that it did not; for the purposes of to-day, he should assume that the law about working upon people by fright did not apply to the case of a child of such tender years as this. Then arose the question, which would be for them to decide, whether this death was directly the result of the prisoner's unlawful act—whether they thought that the prisoner might be held to be the actual cause of the child's death, or whether they were left in doubt upon that upon all the circumstances of the case. After referring to the supposition that the convulsions were brought on owing to the child teething, he said that, even though the teething might have had something to do with it, yet if the man's act brought on the convulsions or brought them to a more dangerous extent, so that death would not have resulted otherwise, then it would be manslaughter. If, therefore, the jury thought that the act of the prisoner in assaulting the girl was entirely unconnected with it, that the death was not caused by it, but by a combination.

of circumstances, it would be accidental death and not man-
slaughter.''

Counsel for petitioner seeks to distinguish the Towers case
from the one at bar, on the ground that the child was not a
rational agent and was not capable of understanding that the
attack on its nurse was not meant for it. The reasoning of
the opinion, however, led the learned judge to the conclusion
that the question for the jury to decide would be, ''whether
they thought that the prisoner might be held to be the actual
cause of the child's death, or whether they were left in doubt
upon that upon all the circumstances of the case,'' and that
''if the man's act brought on the convulsions or brought them
to a more dangerous extent, so that death would not have re-
sulted otherwise, then it would be manslaughter.''

The only case dealing with this question decided by the
courts of this country and to which our attention has been
called is that of *Cox v. People*, 80 N. Y. 500, decided in 1880.
That was a case where the defendant assaulted and bound the
deceased and left her in that condition, and it was supposed
that she died from fright. In considering an instruction
given by the trial court on the subject of death from fright,
Mr. Justice Andrews, speaking for the New York court of
appeals, said:

''The prisoner's counsel excepted to the charge that 'if the
deceased died from fright, and if the fright was caused by
the violence of the prisoner, he is as responsible and can as
properly be convicted under this indictment of murder in the
first degree as if the immediate result of his act was suffoca-
tion.' It is claimed that this charge was erroneous, for the
reason that it was not charged in the indictment that the kill-
ing was by fright superinduced by the acts of violence of the
accused. The indictment charges in some counts that the
prisoner choked, smothered, stifled and suffocated the de-
ceased, and in others that he assaulted the deceased and
killed her by means and instruments to the jurors unknown.
It was not necessary, in order to convict the prisoner, that it
should appear that his actual personal violence was the sole
and immediate cause of the death of the deceased. If his

violence so excited the terror of the deceased that she died from the fright, and she would not have died except for the assault, then the prisoner's act was in law the cause of her death. We are of opinion that the prisoner was properly convicted under the counts charging an assault, and that the prisoner 'in some way and manner, and by the use of some means and instruments, to the jury unknown,' deprived the deceased of her life, if the jury found that the deceased died from fright superinduced by the prisoner's violence.''

As to whether a death caused from fright, grief or terror, or other mental or nervous shock, can be made the basis for a criminal prosecution, has been touched upon but lightly by the text-writers, and none have ventured to enunciate a modern rule on the subject. Such comments and observations as the text-writers have made are valuable as indicating the personal views of the writers touching this matter. Sir James Stephen in his note to art. 221 of his digest of Criminal Law, commenting on the old rule, says:

''Suppose a man were intentionally killed by being kept awake till the nervous irritation of sleeplessness killed him; might not this be murder? Suppose a man kills a sick man, intentionally, by making a loud noise which wakes him when sleep gives him a chance of life; or suppose, knowing that a man has aneurism of the heart, his heir rushes into his room and roars in his ear, 'Your wife is dead,' intending to kill and killing him; why are not these acts murder? They are no more 'secret things belonging to God' than the operation of arsenic. As to the fear that by admitting that such acts are murder, people might be rendered liable to prosecution for breaking the hearts of their fathers or wives by bad conduct, the answer is that such an event could never be proved. A long course of conduct gradually 'breaking a man's heart,' could never be the 'direct or immediate' cause of death. If it was, and it was intended to have that effect, why should it not be murder?''

The author of the text in 21 Am. & Eng. Ency. of Law, 2 ed., p. 98, speaking of the reason for the old rule and the modern trend of authority, says:

"A hint of the reason for this exclusion may be gathered from Lord Hale's assertion that 'secret things belong to God,' upon which Sir James Stephen comments that he suspects the fear of encouraging prosecutions for witchcraft was the real reason. In default of a better explanation it would seem, therefore, that the rule has no firmer foundation than the ignorance and superstition of the time in which it was formulated.

"Hence the courts have in some later cases shown a tendency to break away from the old rule where substantial justice required it. It will be observed, however, that in all these cases the death has been caused by shock of terror produced by an assault, so that the question in many of its aspects may still be regarded as unsettled. Yet on principle there is no reason why a death from nervous irritation or shock should not be as criminal as any other. It certainly entails greater difficulty in the matter of proof, but this is purely a question of fact, and if the prosecution is able to establish its case by evidence satisfactory to a jury, there seems to be no sufficient reason why the law should forbid a conviction."

Clark & Marshall, on the Law of Crimes, 2 ed., p. 314, says: "It is no doubt very true that the law cannot undertake to punish as for homicide, when it is claimed that the death was caused solely by grief or terror, for the death could not be traced to such causes with any degree of certainty. Working upon the feelings and fears of another, however, may be the direct cause of physical or corporal injury resulting in death, and in such a case the person causing the injury may be as clearly responsible for the death as if he had used a knife."

The statute of this state (sec. 6565, Rev. Codes) defines manslaughter as follows: "Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion; 2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act

which might produce death, in an unlawful manner, or without due caution and circumspection.''

Manslaughter has perhaps, in the variety of its circumstances, no equal in the catalogue of crimes. An unlawful killing, though unintentional and involuntary, if accomplished by one while engaged in the commission of an unlawful act, is defined by the statute as manslaughter, and this statute does not circumscribe the means or agency causing the death. The law clearly covers and includes any and all means and mediums by or through which a death is caused by one engaged in an unlawful act. The statute has the effect of raising the grade of the offense in which the party is engaged to the rank of manslaughter where it results in the death of a human being.

With such aid as we get from the foregoing authorities and the independent consideration we have been able to give the matter, we reach the conclusion that it would be unsafe, unreasonable and often unjust for a court to hold as a matter of law that under no state of facts should a prosecution for manslaughter be sustained where death was caused by fright, fear or terror alone, even though no hostile demonstration or overt act was directed at the person of the deceased. Many examples might be called to mind where it would be possible for the death of a person to be accomplished through fright, nervous shock or terror as effectually as the same could be done with a knife or gun. If the proof in such a case be clear and undoubted, there can be no good reason for denying a conviction. If A, in a spirit of recklessness, shoot through B's house in which a sick wife or child is confined, and the shock and excitement to the patient cause death, the mere fact that he did not shoot *at or hit anyone and that he did not intend to shoot anyone* should not excuse him. It should be enough that he was at the time doing an unlawful act or was acting ''without due caution and circumspection.''

It would seem that in some instances force or violence may be applied to the mind or nervous system as effectually as to the body. (1 Russell on Crimes, p. 489.) Indeed, it is a well-recognized fact, especially among physicians and meta-

physicians, that the application of corporal force or violence often intensifies mentally and nervously the physical effects that flow from the use and application of such force or violence.

We express no opinion whatever and refrain from any comment on the evidence in this case. That is a matter to be passed on by a jury. They should determine from all the facts and circumstances whether the accused was the direct and actual cause of the death of the deceased. As was said by Justice Denman in the Towers case, it would be ''laying down a dangerous precedent for the future'' for us to hold as a conclusion of law that manslaughter could not be committed by fright, terror or nervous shock. The fair and deliberate judgment of a jury of twelve men can generally be relied upon as an ample safeguard for the protection of one who should in fact be acquitted. The dangers of unwarranted prosecutions for such causes are no greater or more imminent than from any other cause, while, on the other hand, the proofs will generally be more difficult. The difficulty of making proofs, however, should never be considered as an argument against the application of a rule of law.

The writ is quashed, and the prisoner is remanded to the custody of the sheriff of Washington county.

Sullivan, C. J., concurs.