500 A.2d 676

**Michael STEWART**

**v.**

**STATE of Maryland.**

**No. 65, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Dec. 4, 1985.

Certiorari Denied March 10, 1986.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender and Nancy S. Forster, Assigned Public Defender, on the brief) Baltimore, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County and Richard E. Jordan, Asst. State's Atty. for Montgomery County, on brief, Rockville, for appellee.

Submitted before GILBERT, C.J., and WEANT and GARRITY, JJ.

GARRITY, Judge.

This case principally concerns the criminal responsibility of an assailant under the felony-murder doctrine for the fright-induced death of a robbery victim. Our focus of attention on this issue will be whether the evidence was sufficient to prove a causative relationship between the robbery and the victim's death from heart failure approximately two hours later.

*Facts*

At approximately 11:15 during the evening of November 19, 1983, two men entered the In-Town Motor Hotel in Montgomery County while two others remained in a nearby car. One of the men handed the desk clerk, 60-year old Pearl Pizzamiglio, a paper bag with a note attached which read "Don't say a word. Put all the money in this bag and no one will get hurt!" Mrs. Pizzamiglio placed $176.00 in the bag and the two men fled to their waiting vehicle and drove off. Mrs. Pizzamiglio immediately called the police and within minutes the four suspects were apprehended.

Montgomery County Police Officer Nancy Calder arrived at the motel at 11:21 p.m. and spoke with Mrs. Pizzamiglio in the motel lobby for approximately 35 to 40 minutes. Officer Calder reported that Mrs. Pizzamiglio, who was pale, nervous, and jittery, related that although she did not know if the individual who handed her the note had a weapon, she described him as "scary mean looking." Officer Calder further testified that while in the process of transporting Mrs. Pizzamiglio to the police station in an effort to see if she could identify the individuals who had just been arrested, the officer noticed that Mrs. Pizzamiglio began holding her chest and developed difficulty in breathing. Officer Calder immediately summoned the Rescue Squad which arrived within minutes. Upon administering oxygen, the Rescue Squad transported Mrs. Pizzamiglio to Suburban Hospital, where she arrived at 12:30 a.m. Soon after she arrived at the hospital, Mrs. Pizzamiglio experi-

enced cardiac arrest and, after attempts at treatment proved unsuccessful, expired at 1:28 a.m.

The appellant, Michael Stewart, concedes that he was the person who had handed the bag and attached note to Mrs. Pizzamiglio. At the trial the State presented evidence that the appellant was competent to stand trial and that Mrs. Pizzamiglio had been frightened to death by the robbery. The court determined that the appellant was competent to stand trial and the jury found that Mrs. Pizzamiglio's death was a direct result of the robbery. Stewart was convicted of felony-murder and robbery and found to be responsible at the time of the commission of the offense. The robbery charge was merged into the felony-murder count and Stewart was sentenced to life imprisonment, with all but fifteen years suspended.

The appellant presents the following issues for our review:

1. Whether the trial court erred in failing to make adequate findings regarding appellant's competency to stand trial.
2. Whether the evidence was legally sufficient to sustain a conviction of felony-murder when the underlying offense was an unarmed robbery and the victim died some two hours later of heart failure.
3. Whether the instructions on the issue of causation were erroneous.

### I.  *Competency to Stand Trial*

The appellant's initial argument is that under *Hill v. State*, 35 Md.App. 98, 369 A.2d 98 (1977), the court's failure to stop the trial at various intervals, as well as its failure to conduct a hearing and make findings regarding his competency to stand trial, was reversible error.

After a pretrial hearing on the issue of competency the appellant was found to have been competent at the time of the commission of the offense and competent to stand trial. Three months later, however, on the first day of trial,

appellant's counsel proffered that since the pretrial hearing, the appellant's behavior had been bizarre. Counsel further advised that the day before the trial date, the appellant had been re-examined by his psychiatrist, Dr. Kline, who had not changed his opinion that the appellant was insane and incompetent. Defense counsel cited the fact the appellant was still taking anti-psychotic drugs, and that there had been incidents at the jail he felt demonstrated psychosis. As an example, counsel advised that "[m]y client took his medicine, filled it with water from the toilet, drank it; took butter and tried to rub it all over his head and face." Despite this proffer, the trial judge ruled that the prior determination of competency still remained as the proffer failed to show that the appellant's condition had substantially changed since the prehearing. Furthermore, because of the appellant's erratic behavior throughout the trial, the trial judge made various findings on the record that he believed the appellant was fully able to understand the proceedings and to assist in his own defense.

We discussed in *Hill, supra,* the statute on competency to stand trial (then art. 59, § 23). We quoted from our decision in *Colbert v. State,* 18 Md.App. 632, 308 A.2d 726 (1973) in which we held that:

> The statute requires that the determination be made "upon the testimony and evidence presented on the record," but it does not require that such testimony and evidence be presented in a separate hearing, as appellant contends. We said in *Strawderman* [*v. State*], 4 Md.[App. 689] at page 695 [244 A.2d 888], "Of course, in a jury trial, evidence with regard to it should be received out of the presence of the jury," but we did not say, nor do we now say, that a judge with no jury present is required to use any magic words to designate as a separate hearing the presentation to him of testimony and evidence for his determination of the competency of the accused to stand trial. It is sufficient if the testimony and evidence are on the record.

*Hill* addresses the mandatory nature of an initial determination of competency when the issue is properly raised. *Hill* does not, however, address the discretionary nature of a reconsideration of competency. Because the pretrial hearing met the requirements in *Hill* for the initial competency determination, we believe that the proffer on the first day of trial (that the appellant was incompetent) suggested at most that a reconsideration be made of the appellant's competency.

Health General Art. § 12–103(c) provides:

> Reconsideration of Competency.—At any time during the trial and before verdict, the court may reconsider the question of whether the defendant is incompetent to stand trial.

The language is clear that a reconsideration of competency is discretionary. There are no requirements for an additional hearing to make findings of fact and conclusions of law.

██ We believe that the trial court's finding, that the appellant's mental condition had not changed from the time of the pretrial determination on competency, was not clearly erroneous. We therefore hold that the trial judge did not abuse his discretion in refusing to conduct another hearing on the issue of the appellant's competency to stand trial.

## II. *Criminal Responsibility for Death by Fright*

The thrust of appellant's position is that the evidence was legally insufficient to sustain a conviction of felony-murder. Although he does not contest that Mrs. Pizzamiglio's death occurred subsequent to the robbery that he committed, he argues that his acts were not the legal cause of her death as "death is not a probable and natural consequence of an *unarmed* robbery." (Emphasis supplied.) In support of his theory, the appellant relies on *Campbell v. State*, 293 Md. 438, 444 A.2d 1034 (1980).

The Court of Appeals in *Campbell* was concerned with the responsibility of felons for the lethal acts of others. More particularly, whether under the felony-murder doc-

trine, the killing of a co-felon during an armed robbery, either by a police officer attempting to apprehend him, or by a victim resisting the armed robbery, constituted murder in the first degree on the part of the surviving felon. The Court determined that as the killing of the co-felon had been committed to thwart a felony rather than to further it, the surviving felon was not guilty of murder. Writing on behalf of the Court, Judge Davidson stated:

> We now hold that ordinarily, under the felony-murder doctrine, criminal culpability shall continue to be imposed for lethal acts committed by a felon or an accomplice acting in furtherance of a common design. However, criminal culpability ordinarily shall not be imposed for lethal acts of non-felons that are not committed ·in furtherance of a common design.

Clearly, the thrust of the inquiry under *Campbell*, whether the lethal acts of a non-felon should constitute felony-murder on the part of a surviving felon, is inappropriate to the analysis in the case *sub judice* where the appellant's own conduct and its link to the death of his robbery victim is at issue. We therefore must determine whether the evidence was legally sufficient to establish that Mrs. Pizzamiglio's death was a natural consequence of the appellant's unlawful act.

■ At early common law physical injury was required before criminal responsibility was imposed for homicide. *In re Heigho*, 18 Idaho 566, 110 P. 1029 (1910). The modern trend, however, is to determine criminality according to the degree of causative relationship between the unlawful act of the accused and the death of the victim. Annot., 47 A.L.R.2d 1072. To warrant a conviction for homicide it must be established that the act of the accused was a proximate cause of death. "If the act of accused was the cause of the cause of death, no more is required." 40 C.J.S. *Homicide* § 11.

The appellant's attempts to distinguish various cases which hold an accused criminally responsible for the death of a victim by fright are not persuasive.

The appellant argues that *State v. Spates,* 176 Conn. 227, 405 A.2d 656 (1978) is inapplicable to the present case because in *Spates* the defendant used a gun to rob the victim, tied his hands and legs, and abandoned him despite the victim's pleas for a doctor because he was having a heart attack. The appellant contends that the State's case on causation is much weaker in the instant case. Weaker, however, is not the standard. As noted above, if a direct causal link between the accused's actions and the victim's death can be established, no more is required.

The appellant further argues that neither *State v. Luther,* 285 N.C. 570, 206 S.E.2d 238 (1974) nor *State v. Edwards,* 136 Ariz. 177, 665 P.2d 59 (1983) is applicable to the instant matter. He claims that in both cases there was displayed a deadly weapon which, in one instance, was used. In the instant case no weapon was displayed or used. Furthermore, in *Luther* and *Edwards* the victim died during or immediately following the crime. In the present case the victim expired more than two hours after the incident. As a result, the appellant claims that the causal link between Mrs. Pizzamiglio's death and his unlawful act is not as direct as in *Luther* and *Edwards.*

In *State v. Luther, supra,* the accused struck the victim with a lead pipe. The victim died and an autopsy determined that there had been "a hardening of the arteries of the heart and no traumatic injury sufficient to cause death ..." *Luther,* 285 N.C. at 575, 206 S.E.2d 238. However, it was further determined that "the increased cardiac demand" occasioned by the altercation could have been the cause of death. The Court concluded that if the victim's "death came about as a result of the conjunction of his heart disease with either the violence or excitement and shock of defendant's assault it was still brought about by

defendant's unlawful act, for the consequences of which he would be answerable." *Id.*

The accused in *State v. Edwards, supra,* had robbed bar patrons at gunpoint. In the course of the robbery a gun was placed against the neck of the proprietor who was ordered to open a safe. Suddenly, the victim's face went blank as he "slumped in a chair and began making a snoring sound." When the police arrived at the store, the proprietor was dead. The doctor who performed an autopsy on the victim testified that the cause of death had been due to a heart attack caused by the "fright-flight-fight syndrome." *Edwards,* 136 Ariz. at 186, 665 P.2d 59. He explained:

> [W]hen a person is faced with a stressful or frightening situation, his body will manifest certain reactions. Adrenalin will start to flow and the heart will begin to pound hard, supplying the higher requirement of increased blood to the muscles, preparing the person to fight or flee.

*Id.* Even though the victim suffered from a pre-existing heart disease and "a coronary attack could have been prompted by other causes completely independent of the robbery" the examining doctor maintained that the victim's heart attack and death had been "caused by the anxiety of the robbery." *Id.* From this testimony the Court concluded that "there was sufficient evidence before the jury to support the finding that the attack was caused by the robbery." *Id.*

Despite the factual differences pointed out by the appellant between the case *sub judice* and those above, the similar applications of the law render them indistinguishable. In each of the three cases, criminal responsibility for the victim's death was based on whether the "cause of the cause of death" was the illegal act of the accused. Other cases which turn on this point include *Ohio v. Losey,* No. 84 AP–768 slip op. (Ohio, June 25, 1985); *Durden v. State,* 250 Ga. 325, 297 S.E.2d 237 (1982); *State v. McKeiver,* 89 N.J.

Super. 52, 213 A.2d 320 (1965); and *In re Heigho,* 18 Idaho 566, 110 P. 1029 (1910).

In *Ohio v. Losey, supra,* the defendant Losey approached a house late at night and knocked on the door. After receiving no response from within, he forced the door open and attempted to remove a bicycle. A friend outside warned of a car approaching slowly and the defendant left the bike beside the door and fled, leaving the front door open. The homeowner testified that he heard a noise and soon thereafter his mother, who shared the residence, came to his bedroom because she too had heard a noise. Together they went to the living room whereupon they discovered the front door open and the bicycle near the door. The son testified that his mother was very upset upon discovering the burglary and that he had never seen her that upset. Soon thereafter she collapsed. The emergency squad was called and after attempting to revive her for almost an hour the mother was pronounced dead. The coroner opined that the cause of death was coronary thrombosis brought on by the emotion of discovering the burglary. The trial court found the defendant criminally responsible for the death of the woman and he appealed.

The Ohio Court of Appeals upheld the conviction of involuntary manslaughter and concluded that:

It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct.

The accused in *Durden, supra,* was convicted of felony-murder. The evidence at his trial revealed that the defendant entered a store from the roof and activated a "movement-sensitive" alarm in the owner's home behind the store. The owner notified the police and then went to the store to investigate. Shots were exchanged between the store owner and the defendant. Although the store owner was not wounded, within minutes after the police arrived, he suf-

fered a heart attack and expired. The victim suffered from arteriosclerotic cardiovascular disease. The medical examiner testified that the victim's death was the result of small coronary arteries and stress from the events preceding his death.

On appeal Durden argued that the evidence was insufficient to establish that his actions were the proximate cause of the victim's death. In upholding the conviction, the Supreme Court of Georgia stated that:

> Where one commits a felony upon another, such felony is to be accounted as the efficient, proximate cause of death whenever it shall be made to appear either that the felony directly and materially contributed to the happening of a subsequent accruing immediate cause of death, or that the injury materially accelerated the death, although proximately occasioned by a pre-existing cause.

*Durden,* 250 Ga. at 329, 297 S.E.2d 237.

In *McKeiver, supra,* the defendant, who had been charged with murder, moved to dismiss the indictment on the theory that his acts did not substantiate a charge for felony-murder because he had not had any direct contact with the victim. The facts revealed that McKeiver entered a tavern, fired a shot in the ceiling, and ordered the bartender and the patrons to one end of the bar while he took approximately $90 from the cash register. He then ordered everyone to walk toward the front door. One of the patrons fell to the floor and the defendant fled the scene. Despite being administered first aid, the fallen patron died. An autopsy revealed that the victim's death was "due to fright during hold-up in tavern: cardiac arrest; occlusive arteriosclerotic coronary artery disease." The New Jersey Superior Court denied McKeiver's motion and stated:

> Fright, or other "mental force" as it had been called, 1 Bishop, New Criminal Law, (8th ed.1892), sec. 562, will receive judicial recognition if it is accompanied by physical force. Physical force does not necessitate physical contact, because one can exert physical force over anoth-

er by "working upon the fancy of another or treating him harshly or unkindly," as by certain actions which might cause him to "die of fear or grief." 1 HALE P.C. 429; 1 East P.C. 225.

*McKeiver,* 89 N.J.Super. at 57, 213 A.2d 320.

The accused in *Heigho, supra,* while wearing a gun in plain view, went to the home of a person named Barton. An argument between the defendant and Barton ensued and during the altercation Barton's mother-in-law, Mrs. Rigleman, became upset and excited. Shortly thereafter, Mrs. Rigleman died. An attending physician made a post-mortem examination and determined that the death was attributable to an aneurysm of the ascending aorta. The physician stated that excitement was one of the three principal causes that produce such a result.

The Supreme Court of Idaho pursuant to a petition for habeas corpus, as to whether a charge of manslaughter could be brought under the circumstances, determined that:

[I]t would be unsafe, unreasonable and often unjust for a court to hold as a matter of law that under no state of facts should a prosecution for manslaughter be sustained where death was caused by fright, fear or terror alone, even though no hostile demonstration or overt act was directed at the person of the deceased. Many examples might be called to mind where it would be possible for the death of a person to be accomplished through fright, nervous shock or terror as effectually as the same could be done with a knife or gun.

. . . . .

It would seem that in some instances force or violence may be applied to the mind or nervous system as effectually as to the body.

*Heigho,* 18 Idaho at 576, 110 P. 1029.

Against this legal background the evidence in the case *sub judice* must be analyzed. The test on review of the sufficiency of the evidence is whether any rational trier of fact could have found beyond a reasonable doubt that the

appellant's felonious acts caused Mrs. Pizzamiglio's death. *State v. Rusk*, 289 Md. 230, 240, 424 A.2d 720 (1981), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The evidence before the jury was that Mrs. Pizzamiglio had been robbed by the appellant shortly after she began the all-night desk shift at the In-Town Motor Hotel. She called the police at 11:21 p.m. Officer Nancy Calder arrived shortly thereafter. Upon arrival, the officer observed that the victim was pale and nervous, which she had not been when Officer Calder had seen her the previous evening. The victim related that a man, whom she described, handed her a bag which had a note on it instructing her to put all the money in the bag and she would not be hurt. As she did so, the man told her he was watching her actions in a mirror behind her. The victim stated that she did not know if the man had a gun but that he appeared to be "scary mean looking." Officer Calder stated that she and the victim remained at the scene approximately 35–40 minutes, during which time the victim's physical symptoms continued. When Mrs. Pizzamiglio entered Officer Calder's police car to be driven to the police station, the victim indicated that she was having difficulty in breathing and held her upper chest. She exited the police car and sat down on the curb. Officer Calder called the rescue squad, which arrived within a few minutes. The victim appeared nauseated, and unable to breathe or to talk. She was given oxygen and taken to the hospital.

Officer Calder testified that prior to these events, while still in the hotel, Mrs. Pizzamiglio had agreed to go to the police station to identify the apprehended suspects, but was most reluctant to do so. The news itself, however, that an identification would be needed did not seem to cause a visible change in her condition, according to the officer.

James Resnick was the paramedic who responded with a crew in a "cardiac unit" ambulance. He arrived at the hotel at 12:17 a.m. He observed that the victim had labored,

"gurgly" breathing. In the ambulance, her vital signs were monitored. Her breathing was three to four times faster than normal and her heart beat was extremely fast. She was ashen, cold, and sweaty and had fluid in her lung.[1] While en route to the hospital the victim began having premature ventricular contractions, which Resnick described as a very dangerous condition of irregular heart beat.

Upon arrival at the hospital at 12:30 a.m. Mrs. Pizzamiglio was taken to the "code blue" room for cardiac arrest patients. Dr. Douglas Koth was the treating emergency room physician. He testified that she had acute respiratory distress, rapid heart beat, and was semiconscious. She then went into respiratory failure and full cardiac arrest. Her heart continued to beat in a disorganized irregular fashion and would not respond to the medications applied by the emergency room staff. Mrs. Pizzamiglio was pronounced dead at 1:28 a.m.

The most crucial evidence presented by the State was given by two cardiologists, Drs. Gerald Scugol and Robert S. Elliot. Dr. Scugol, a physician specializing in cardiovascular diseases, concluded that the cause of Mrs. Pizzamiglio's death was that the acute emotional stress she had been subjected to set into motion a chain of events that resulted in acute heart failure. He further concluded that the fact that two hours had elapsed prior to death did not change his opinion, as the victim had symptoms of heart failure near the precipitating event, and it took two hours beyond that event for her to expire.

Dr. Robert Elliot, a leading national cardiologist, reviewed all records pertaining to Mrs. Pizzamiglio, and most particularly, microscopic slides of her heart muscle. His conclusion as to the cause of her death was as follows:

---

1. Mrs. Pizzamiglio had only one lung due to a prior surgical removal of the other, which was cancerous.

The changes I saw were the most extreme I have ever seen in any example in which the effects of adrenaline-like substances caused the heart to overcontract and within a matter of five minutes in our studies what happens is when that heart overcontracts and these little muscle fibers overcontract individually, they can no longer function again.

The changes that one sees under a microscope are an absolute hallmark of this kind of stress-induced death; death of heart muscle; which is brought on by huge amounts of adrenaline dumped into the system causing the heart muscle to react like a horse that has been whipped to the point where it collapses.

The doctor went on to conclude that:

[T]he insult that she experienced and the fear that she experienced in the robbery was the critical event that tipped this over from the medical [to] the police records. I don't know of anything else that could have done it.

■ We believe that the evidence was sufficient to support the jury's finding that fright or shock of the robbery committed by the appellant had caused Mrs. Pizzamiglio's adrenaline induced heart failure. We conclude that any rational trier of fact could have found beyond a reasonable doubt, from the evidence, that the surge of adrenaline was in response to the fear Mrs. Pizzamiglio encountered as a result of having been placed in fear and robbed by the appellant. We, therefore, hold that under the facts and circumstances of this case, the evidence was sufficient to sustain the felony-murder conviction.

### III.  *Jury Instructions*

The appellant's final assignment of error is that the trial court's instructions on causation were erroneous. He argues that "shortening of life" is not murder and that the State had the burden of showing that the appellant committed a lethal act during the course of the robbery which caused the victim's death. He further argues that the

instructions were based on tort law concepts of causation. These arguments are without merit.

The court's instructions were, in part, as follows:

The law in the State of Maryland provides that any death occurring during the perpetration of a felony constitutes felony-murder.

In order for the defendant to be found guilty of felony-murder, the State must prove the following beyond a reasonable doubt:

First, that a serious felony, such as robbery, was attempted or committed. Second, that the robbery was committed by the defendant or was aided and abetted by the defendant.

Third, that a death resulted from the perpetration or attempted perpetration of the robbery and, fourth, that there is a causal connection between the death and the robbery.

.    .    .    .    .

Therefore, if the death occurred independent from the acts in furtherance of the crime, a felony-murder has not been proven.

It is not essential, however, that the ultimate harm which resulted was either foreseen or intended by the actor.

It is sufficient that the harm is reasonably related to the act of the defendant. Now the requirement that the death occur in the perpetration of a felony does not mean that the death must actually occur at the same time as the criminal event itself, but it does require that there be no intervening cause independent of the crime which brings about the death.

The requisite causal connection between the death and the crime does not require that the act of robbery be the sole reason for the death.

One who commits a crime does not cease to be responsible for his otherwise criminal conduct merely because

there are other conditions which contributed to the same result.

So that any predisposing physical condition contributing to a victim's death does not diminish the criminal responsibility of the felon, even if he was unaware of that physical condition.

So that the wrongdoer or the felon takes his victim as he finds them, and any shortening of life that may have been caused by the felon in the commission of a felony would be sufficient to form the basis of felony-murder.

It is clear that the trial judge's reference to "shortening of life" was in the context of a wrongdoer actually causing death to a person who had a pre-existing impaired physical condition. As summarized in *People v. Stamp*, 2 Cal. App.3d 203, 82 Cal.Rptr. 598 (1970), where the victim of a homicide by fright had a substantial history of heart disease:

So long as a victim's predisposing physical condition, regardless of its cause, is not the only substantial factor bringing about his death, that condition, and the robber's ignorance of it, in no way destroys the robber's criminal responsibility for the death.

.    .    .    .    .

So long as life is shortened as a result of the felonious act, it does not matter that the victim might have died soon anyway ... In this respect, the robber takes his victim as he finds him.

*Id.* 82 Cal.Rptr. at 603.

■ Finally, defense counsel requested that the court give the jury a detailed instruction explaining the differences between tort concepts of foreseeability and proximate cause, and those required in a criminal case. We believe the court properly declined to do so. The case at bar did not involve the law of torts and the jury had not been exposed to that subject. As Judge Sanders astutely noted:

Well, that is legal talk, and they are not talking about torts. I think they understand it has to be directly resulting from the criminal act.

Thus, the requested injection of complex legal concepts, though appropriate matters for students, lawyers and judges, would have simply misled and confused the jury in this case. We hold that the court's instructions were proper.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.