**Richmond**

MICHAEL LEE SPAIN, SR.

v.

COMMONWEALTH OF VIRGINIA

No. 1328-86-2

Decided November 15, 1988

COUNSEL

James F. Parkinson, III (Smith, Moncure, Blank, Isaacs & Hinton, on brief), for appellant.

Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

COLE, J. — The appellant, Michael Lee Spain, Sr., appeals his convictions of burglary, robbery and felony murder, contending that (1) the court should have granted the motion to quash the felony murder indictment; (2) the trial court erred in refusing to order a separate trial on the felony murder charge; (3) his double jeopardy rights were violated when he was convicted, in a single trial, of both felony murder in violation of Code § 18.2-32 and the underlying felony; (4) the trial court erred in granting the Commonwealth's Instruction No. 4 and denying his Instruction No. A on causation; (5) the trial court erred in refusing the defendant's Instructions B, C and D on manslaughter and accidental death; and (6) the evidence was insufficient to sustain a conviction of felony murder. We find no error and affirm.

I.

At about 7:30 a.m. on the morning of August 18, 1986, Pam Craig visited the home of her elderly neighbor, Ethel Williams. The eighty-six year old Williams had recently undergone eye surgery and could not see well. The purpose of Craig's visit was to administer drops into Williams' eyes. Craig said that Williams was feeling fine and that she did not observe any bruises or abrasions on her body. Around noon that same day, Craig observed the appellant, Spain, walk up to Williams' front porch and knock on the door. When Williams answered the door, Spain pushed her away from the door, entered her home and shut the door. When Craig saw the blinds moving and heard Williams screaming, she telephoned the police.

When Officer Segal of the Richmond City Police Department arrived, he found Williams, shaking and screaming for help, on the rear steps to her home. She was bruised and blood was run-

ning down her legs. As Segal attempted to rescue her, Spain exited the back door with jewelry boxes and other items in his arms. Segal drew his gun and commanded Spain to stop. Spain, stunned by the officer's presence, shoved Williams down the steps with his shoulder and retreated into the home. Segal had to pick Williams up and carry her to safety because her legs were hurt and she could not see. Other officers arrived on the scene and surrounded the house; Spain eventually surrendered.

Williams had cuts, bruises and scrape marks on her neck, arms and legs. She began to complain of chest pains. She was admitted to the MCV hospital at 6:45 p.m. that evening. An electrocardiogram revealed that she was suffering a myocardial infarction (heart attack). Medication was administered but Williams continued to experience chest pain. Emergency surgery was performed in the early hours of August 19. A pacemaker was inserted due to the instability of Williams' heart. Her blood pressure continued to drop, however, and she died at 6:00 a.m. that morning.

An autopsy revealed that Williams had high blood pressure and had been suffering from severe atherosclerotic coronary artery disease (extensive narrowing of the arteries). Her condition was caused by a build-up of cholesterol (plaque) in the arteries which reduces the diameter of the artery and makes it more difficult for a sufficient supply of blood to flow through it.

Dr. Marsella Fierro, a medical examiner who performed the autopsy, opined that Williams died of a stress-induced heart attack. She based this opinion on the history given to her of the day's events preceding Williams' death and the condition of her heart. When an individual becomes frightened, stated Dr. Fierro, adrenal hormones are produced that cause the heart rate to increase and the blood vessels to dilate in anticipation of increased need. Where one suffers from atherosclerotic coronary artery disease, the diameter of the artery does not dilate to permit the increased flow of blood that is being supplied by the increased heart rate. When this occurs, a blood clot, or thrombus, often forms and the individual suffers a heart attack.

Spain was tried and convicted, in a single trial, of burglary, robbery and felony murder. This appeal followed.

## II.

Spain filed a motion to quash the indictment, which charged that he feloniously and unlawfully killed and murdered Ethel T. Williams in violation of Code § 18.2-32. The basis of his motion was that "one who inflicts a wound that is non-mortal in and of itself which may cause the acceleration of a pre-existing disease already present in the victim cannot be criminally responsible for the death of the victim." The trial court heard argument on the motion and properly dismissed it.

█ Code § 19.2-221, providing for short form indictments for murder, states: "[A]ny form of . . . indictment . . . which informs the accused of the nature and cause of the accusation shall be good," and "validates murder indictments which allege only that the defendant 'feloniously did kill and murder' the victim." *Simpson v. Commonwealth*, 221 Va. 109, 115, 267 S.E.2d 134, 138-39 (1980). The indictment was drawn in accordance with Code § 19.2-221 and Form 4 of Rule 3A:6. It informed Spain of the nature and cause of the accusation against him and otherwise complied with all statutory requirements. Spain's motion questioned the sufficiency of the expected trial evidence based upon Spain's theory of the case and was at the least premature. He raised no cognizable claim concerning the indictment's compliance with Code §§ 19.2-220 and 19.2-221. Therefore, we find no error in the dismissal of the motion to quash the indictment.

## III.

█ We likewise find no merit in Spain's contention that the trial court erred in not granting his motion for separate trials. Rule 3A:10(b) provides that an accused may be tried at one time for all offenses pending against him if the offenses are based on the same act or transaction and "if justice does not require separate trials." We conclude that justice did not require separate trials because the robbery and felony murder clearly arose out of the same occurrence or transaction. Substantially the same evidence would have been produced at separate trials. On this record we cannot conclude that prejudice in determination of guilt or sentencing could have resulted from trying the offenses together in a single trial.

## IV.

■ Spain asserts that his double jeopardy rights were violated when he was convicted, in a single trial, of both felony murder[1] and the underlying felony. We disagree. Double jeopardy embodies three guarantees. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (footnote omitted). Where multiple convictions occur in a single trial, only the third guarantee, *viz.*, that against multiple punishments, is implicated. *Turner v. Commonwealth*, 221 Va. 513, 529, 273 S.E.2d 36, 46-47 (1980), *rev'd on other grounds*, 476 U.S. 28 (1985).

■ The role of this third aspect of double jeopardy is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. *See United States v. Jorn*, 400 U.S. 470, 479 (1971) (plurality opinion). Double jeopardy is not violated when multiple convictions and punishments are obtained in a single trial if "[t]he General Assembly has clearly indicated its intent to impose multiple punishments." *Turner*, 221 Va. at 530, 273 S.E.2d at 47.

■ No Virginia appellate court has directly addressed whether conviction in a single trial of both felony murder in violation of Code § 18.2-32 and the underlying felony violates the double jeopardy prohibition. However, in *Fitzgerald v. Commonwealth*, 223 Va. 615, 292 S.E.2d 798 (1982), *cert. denied*, 459 U.S. 1228 (1983), the Virginia Supreme Court held that conviction, in a single trial, of both capital murder in violation of Code §§ 18.2-31(d) and (e) and the underlying felonies did not violate double jeopardy guarantees. Upon reviewing the legislative history of "the murder statutes," the court concluded that the legislature's

---

[1] Virginia has three felony murder statutes. Code § 18.2-31 prohibits the "willful, deliberate and premeditated killing" of a person in the commission of a number of specified felonies.

Code § 18.2-32, pertinent to this case, prohibits murder in the commission of, or attempt to commit, arson, rape, forcible sodomy, inanimate object sexual penetration, robbery, burglary or abduction.

Code § 18.2-33 prohibits "[t]he killing of one accidentally, contrary to the intention of the parties, while in the prosecution of some felonious act" other than those specified in Code §§ 18.2-31 and 18.2-32.

purpose in making reference to felonies in the murder statutes was gradation. *Id.* at 636, 292 S.E.2d at 810. It then concluded that "[t]he overriding purpose of the murder statutes being gradation, we can divine no legislative intent to eliminate punishment for other offenses included in the murder statutes solely for the purpose of categorizing the murder." *Id.* Based on the language in *Fitzgerald* that the purpose of reference to felonies in the murder statutes is gradation and not prohibition of punishment for the underlying felonies, we conclude that double jeopardy was not violated when Spain was convicted, in a single trial, of both felony murder in violation of Code § 18.2-32 and the underlying felony.

V.

Next, Spain contends that the jury was misinstructed on the element of causation. Spain offered and was refused Instruction A which is based on *Livingston v. Commonwealth*, 55 Va. (14 Gratt.) 592 (1857):

The Court instructs the jury that if you find from the evidence that the wounds or the beating inflicted by the defendant upon Ethel M. Williams were not mortal, and Mrs. Williams, whilst laboring under the effects of the violence, became sick of a disease, not caused by such violence, from which disease death ensued within a year and a day, then Michael Lee Spain is not criminally responsible for the death, even though the symptoms of the disease were aggravated and its fatal progress quickened by the enfeebled or irritated condition of the deceased, caused by that violence, and you shall find the defendant not guilty of murder.

In *Livingston*, the victim was the defendant's mistress. On the Saturday before her death, the defendant beat the victim. About two hours later, she complained of a violent pain in her side. She died the following Thursday. A physician testified that the cause of death was peritonitis, which is the inflammation of the peritoneum, a cerous membrane which covers most of the viscera of the abdomen. He further testified that the peritonitis was not caused by the beating. *Id.* at 593-94. Because a disease supervened between the beating and the death and the disease was not caused by the beating, the court held that the chain of causation had

been broken. *Id.* at 601-02.

The significant phrase in Spain's proffered instruction is "becomes sick of a disease, *not caused by such violence*, from which disease death ensues." (emphasis added). There is no evidence that Mrs. Williams became sick of a disease not caused by the trauma of the robbery. To the contrary, the evidence is uncontradicted that she had a *pre-existing* disease, coronary atherosclerosis, and that the trauma of the robbery caused her heart attack which resulted in her death. Therefore, the trial court correctly refused to give Spain's Instruction A since there was no evidence in the record to support it.

Spain also objected to the granting of Instruction No. 4 requested by the Commonwealth. He did not set forth specifically any objection to the language of the instruction. He claimed that the instruction was contrary to "the *Livingston* case" and that the "*Livingston* case was the law in Virginia." He offered no substitute and made no suggestion to amend the instruction. His argument was that Instruction No. 4 incorrectly stated the rule on causation and, further, he argued that Williams' death resulted from her pre-existing heart disease and not from the acts he inflicted upon her.

 Because the victim of a felonious act dies after infliction of an injury does not necessarily impose criminal liability upon the perpetrator. To place such criminal liability on him, the injury must be a cause of the victim's death. In every prosecution for the commission of a homicide the Commonwealth must prove that the party alleged to have been murdered is dead, and that death resulted from the criminal act or agency of another.

> The [felony-murder] doctrine was developed to elevate to murder a homicide committed during the course of a felony by imputing malice to the killing. . . . The justification for imputing malice was the theory that the increased risk of death or serious harm occasioned by the commission of a felony demonstrated the felon's lack of concern for human life. The purpose of the doctrine was to deter inherently dangerous felonies by holding the felons responsible for the consequences of the felony, whether intended or not. While the range of felonies which may be a predicate for the felony-murder conviction has changed, the function of the doctrine

is still to elevate to murder a homicide resulting from a felony by imputing malice.

*King v. Commonwealth*, 6 Va. App. 351, 354, 368 S.E.2d 704, 705-06 (1988)(citations omitted).

With Code § 18.2-32, the legislature made killing with malice while committing or attempting to commit one of certain other specified felonies a form of first-degree murder. Neither premeditation nor an intent to kill is an element of felony-murder, but malice is.

"Malice inheres in the doing of a wrongful act intentionally or without just cause or excuse, or as a result of ill will . . . ." Where a person maliciously engages in criminal activity, such as robbery, and homicide of the victim results, the malice inherent in the robbery provides the malice prerequisite to a finding that the homicide was murder. And, all of the criminal participants in the initial felony may be found guilty of the felony-murder of the victim so long as the homicide was within the *res gestae* of the initial felony.

*Wooden v. Commonwealth*, 222 Va. 758, 762, 284 S.E.2d 811, 814 (1981) (citations omitted).

Based upon these general principles of law, we must consider whether the trial court should have granted Instruction No. 4:

It is not necessary for a conviction of murder that the wounds, injuries or trauma be the direct cause of death; it is sufficient if the initial wound, injury or trauma causes death indirectly through a chain of natural causes.

The instruction given by the court is similar to the language used in 40 Am. Jur. 2d § 20 (1968) which states:

One who inflicts a blow or wound upon another, which devolves into or initiates an affliction or disease, is criminally responsible for the death of such person ultimately resulting from the affliction or disease. It is not indispensable to a conviction that the wounds be necessarily fatal and the direct cause of death. It is sufficient that they cause death indi-

rectly through a chain of natural effects and causes unchanged by human action.

This same language was quoted with approval in *State v. Durham*, 156 W. Va. 509, 195 S.E.2d 144 (1973): "It is, of course, not indispensable to a conviction for murder that the wounds be the direct cause of death. It is sufficient if the initial wound caused the death indirectly through a chain of natural causes." *Id.* at 518, 195 S.E.2d at 149.

A "direct cause" may be defined as the active, efficient cause that sets in motion a chain of circumstances which brings about a result without the intervention of any force started and working actively from a new and independent source. *Hinton v. State*, 124 Cal. App. 622, 269 P.2d 154, 157 (1954).

The last part of the instruction advises the jury that the evidence is sufficient to convict the defendant if the initial wounds or trauma cause death indirectly through a chain of natural causes. We agree that this is a correct statement of the law and that the evidence was sufficient to support the granting of the instruction. All the evidence, including the testimony of the medical experts, disclosed that Williams had bruises on her legs, face, trunk, and arms, consistent with blunt force injury. The medical history obtained by the medical examiner disclosed that shortly after these traumatic events, she had an onset of chest pain. The chest pain did not cease and she continued to be in distress. Several hours later, she went to the hospital, where an electrocardiogram showed a heart infarction, or death of the heart muscle with shortness of blood. The medical examiner testified that Williams' heart was dying in stages from the time of the traumatic event until the time she breathed her last breath. In her expert medical opinion, Williams died from a heart attack induced by the stress of the traumatic event. Therefore, the evidence proved beyond a reasonable doubt that Spain's unlawful acts caused Williams' death. We, therefore, hold that the trial court did not err in granting Instruction No. 4.

## VI.

Spain also contends that the trial court erred in refusing to grant Instructions B, C and D on manslaughter and accidental

death. The record does not contain any reference to an Instruction D, and, therefore, we will not consider it.

Instruction B provided:

The difference between murder and manslaughter is malice. When malice is present, the killing is murder. When it is absent, the killing can be no more than manslaughter.

Instruction C provided:

Where the defense is that the killing was an accident, the defendant is not required to prove this fact. The burden is on the Commonwealth to prove beyond a reasonable doubt that the killing was not accidental. If after considering all the evidence you have a reasonable doubt whether the killing was accidental or intentional, then you shall find the defendant not guilty.

Spain contends that, because he did not intend to kill Williams, the evidence supported a jury verdict of acquittal or a conviction of manslaughter. Therefore, argues Spain, Instructions B and C should have been given. This contention is without merit. "Neither premeditation nor an intent to kill is an element of felony murder, but malice is." *Wooden v. Commonwealth,* 222 Va. at 762, 284 S.E.2d at 814. "Where a person maliciously engages in criminal activity, such as robbery, and homicide of the victim results, the malice inherent in the robbery provides the malice prerequisite to a finding that the homicide was murder." *Id.* Consequently, the trial court properly refused to instruct the jury on manslaughter and accidental death.

## VII.

Finally, Spain maintains that the evidence was insufficient to convict him of felony murder in violation of Code § 18.2-32. On appeal, we view the evidence in the light most favorable to the Commonwealth and give to the evidence all reasonable inferences fairly deducible therefrom. The jury's verdict will not be disturbed unless plainly wrong or without evidence to support it. Code § 8.01-680; *Higginbotham v. Commonwealth,* 216 Va. 349, 352,

218 S.E.2d 534, 537 (1975). Applying this standard, we find that the jury's verdict was not plainly wrong.

Spain was seen forcing his way into Williams' home. The blinds were moved about and Williams was heard screaming. Upon arriving at the scene, police observed Williams on the back step, bruised and bleeding, screaming for help. Spain soon arrived on the back steps carrying jewelry boxes and other items. This evidence, we believe, is sufficient to establish robbery, the underlying felony. Robbery having been established, the requisite malice for felony murder is thereby established. *See Wooden*, 222 Va. at 762, 284 S.E.2d at 814.

When Spain saw the police, he shoved Williams down the steps and retreated into her home. At that time, she began to complain of chest pains. She was admitted to the hospital that evening and diagnosed as having a heart attack. Efforts were undertaken to save her, but Williams died at 6:00 a.m. the next morning. Dr. Dunlap testified, and the medical examiner confirmed, that Williams had a preexisting heart disease which contributed to her death. The medical examiner opined that Williams died of a stress-induced heart attack and that the robbery of a woman in Williams' condition was a sufficient stress to trigger such a heart attack.

We find that this evidence is more than sufficient to support a finding that the trauma of the robbery caused Williams' death. *See, e.g., People v. Hernandez*, 169 Cal. App. 3d 282, 287, 215 Cal. Rptr. 166, 168 (1985); *Durden v. State*, 250 Ga. 325, 329, 297 S.E.2d 237, 241 (1982); *State v. Reardon*, 486 A.2d 112, 118 (Me. 1984); *Stewart v. State*, 65 Md. App. 372, ____, 500 A.2d 676, 679 (1985); *State v. Smith*, 210 N.J. Super. 43, ____, 509 A.2d 206, 213 (1986); *Commonwealth v. Evans*, 343 Pa. Super. 118, ____, 494 A.2d 383, 389 (1985). In the light most favorable to the Commonwealth, all of the elements of felony murder were sufficiently proved beyond a reasonable doubt. Consequently, the jury's verdict was not plainly wrong or without evidence to support it.

For the foregoing reasons, we affirm the judgment below.

*Affirmed.*

Koontz, C.J., Benton, J., concurred.