655 A.2d 1311

**Dionne Chevelle BROOKS,**

v.

**STATE of Maryland.**

**No. 836, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

March 30, 1995.

204

206

Louise Kelley, Student Atty. (Rule 16) (Margaret L. Lanier, Asst. Public Defender and Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Submitted Before MOYLAN, DAVIS and JAMES S. GETTY (Ret.), Specially Assigned, JJ.

DAVIS, Judge.

Appellant, Dionne Chevelle Brooks, was charged with several crimes relating to the death of Margaret Kobic. Following a jury trial in the Circuit Court for Baltimore County (Fader, J.), appellant was convicted of first degree felony murder and robbery with a dangerous and deadly weapon. The State sought the death penalty. After appellant waived her right to jury sentencing, the court, sitting without a jury, imposed a sentence of life without parole for the felony murder conviction. The robbery conviction was merged.

Appellant presents three questions for our review, which we renumber for our convenience:

    I.   Did the trial judge err when he refused to instruct the jury that all murder is presumed to be murder in the second degree?

II.  Did the consideration of the underlying felony of robbery in both the guilt/innocence and sentencing phases of appellant's trial violate her right under the Maryland Declaration of Rights and the federal constitution to be free from cruel and unusual punishment?

III.  Was the trial judge's advice to appellant regarding her waiver of jury sentencing flawed, thus rendering the waiver ineffective?

## FACTS

It is undisputed that appellant killed Margaret Kobic. The central question for the jury was appellant's state of mind at the time of the homicide.

As a witness for the State, Sam Goodwin testified that he and his mother, Ms. Kobic, shared a two-bedroom apartment in Baltimore County. Goodwin was employed doing maintenance work and carpentry. He kept a bucket of tools in his bedroom, including a carpenter's plane. In March of 1993, Goodwin became friends with Brooks while participating in a drug treatment program. Before she was released from the program, appellant told Goodwin that she "had nowhere to go," and he offered to let her stay with him and his mother. On March 31, 1993, appellant moved into Goodwin's apartment. Goodwin slept on the couch and let appellant use his bedroom.

On April 2, 1993, Goodwin left for Pennsylvania to visit his son. On April 16, he spoke with appellant by phone, and told her that he planned to move to Pennsylvania. According to Goodwin, both appellant and his mother were upset by his announced plans. After observing that his mother was intoxicated, Goodwin hung up on her.

On Sunday, April 16, Goodwin returned to retrieve his belongings and found his mother dead on the kitchen floor. There was blood on the floor, walls, and ceiling. Brooks was gone, but Goodwin found her jacket on a path leading from the apartment complex to a nearby shopping center. The police

found no signs of forced entry. A crime lab technician testified that the victim was lying on her back, with her clothing pulled up toward her neck. There was a massive head wound around the eye.

Dr. Anne Dixon, a medical examiner who supervised the autopsy, testified that there were multiple injuries to the right side of the head. Dr. Dixon estimated that there were at least twenty-five separate blows, but added that the injuries were overlapping, and that it was impossible to make an accurate count. There were also multiple skull fractures.

Appellant testified on her own behalf. After learning that Goodwin intended to move, she and Kobic left the apartment to get liquor, cigarettes, and beer. Kobic used her ATM card to get money, and appellant memorized the PIN number. Appellant stated that she hoped to steal the card, and planned to buy drugs with money stolen from Kobic's account.

Appellant and Kobic returned to the apartment and continued drinking. According to appellant, the pair quarrelled, and Kobic slapped appellant in the face. Kobic apologized, and the pair began to discuss their plans to live together after Goodwin moved out. At some point, Kobic allegedly touched appellant's breasts without any warning. Appellant explained that this unwanted touching made her feel "weird" and "creepy." She responded by hitting Kobic over the head with a bottle, and wrapping an electrical cord around her neck. Appellant then proceeded to Goodwin's bedroom, retrieved his carpenter's plane, and struck Kobic repeatedly over the head.

After she realized that Kobic was dead, appellant took jewelry from the body. She ransacked the bedroom and retrieved Kobic's wallet, checkbook, and ATM card. She also took a television set and Goodwin's paycheck. Before leaving the apartment, appellant washed the blood from her hands and placed the plane, bottle, and electrical cord in a plastic bag, which she left in a dumpster. Over the next two days, appellant used the ATM card, pawned two rings, and purchased drugs with the money. On April 20, 1993, she turned herself in to the police. She later gave a full confession.

At trial, appellant argued that she was not criminally responsible for the killing. Pamela Taylor, a social worker, testified that appellant was reared in a dysfunctional family and had suffered for years from sexual and physical abuse. According to Taylor, one of appellant's stepfathers forced her to have intercourse with him from the time she was thirteen years old. He also tried to sodomize her and threatened to kill family members if she told anyone what he had done. At the age of fifteen, appellant became pregnant with her stepfather's child, had an abortion, and thereafter attempted suicide.

Appellant also offered the testimony of Dr. Stephen Siebert, a psychiatrist. According to Dr. Siebert, appellant suffers from a borderline personality disorder arising from the trauma of her childhood abuse. Appellant's already-vulnerable personality was weakened by years of substance abuse, which yielded paranoid symptoms. As a result, Dr. Siebert explained, appellant "snapped" when Kobic touched her, because she perceived the touching of her breasts as a "prelude to rape." Dr. Harminder Mallik, the State's expert witness, also testified that appellant suffered from a mental disorder. In his view, however, appellant knew what she was doing and did not lack the capacity to control her conduct.

A jury convicted appellant of first degree felony murder and robbery with a dangerous and deadly weapon. She was acquitted on charges of first degree premeditated murder, as well as second degree murder. The State sought the death penalty, and appellant waived her right to a jury sentencing. The only aggravating circumstance was the fact that appellant committed the murder during the course of a robbery. The mitigating circumstances found by the judge included appellant's surrender and subsequent confession, the "horrible" circumstances of appellant's upbringing, the absence of any prior criminal history involving a crime of violence, and the fact that the murder was not premeditated.[1] After weighing

---

1. The judge rejected appellant's assertion that the murder was committed while her capacity to appreciate the criminality of the conduct or to conform her conduct to the requirements of the law was substantially

the circumstances, the judge sentenced appellant to life without parole. This appeal followed.

## LEGAL ANALYSIS

### I

■ Appellant first contends that her conviction must be reversed because the trial court refused to give an instruction regarding the applicable law. Defense counsel requested that the lower court instruct the jury that "the defendant is entitled to an assumption that all murder is only murder in the second degree. The State must prove that it rises to first degree. . . ." The judge rejected the proposed instruction. In support of her position, appellant refers us to *Abney v. State*, 244 Md. 444, 448, 223 A.2d 792 (1966), *cert. denied*, 387 U.S. 925, 87 S.Ct. 2043, 18 L.Ed.2d 981 (1967), wherein the Court of Appeals noted that "[a] felonious homicide is presumed to have been committed with malice aforethought and so to constitute murder in the second degree." In *Hook v. State*, 315 Md. 25, 28 n. 5, 553 A.2d 233 (1989), the Court again noted that felonious homicide "is presumed to be murder in the second degree," and that "[t]he burden is on the state to show that the killing was within the statutory definitions of first degree murder. . . ." *See also Oates v. State*, 97 Md.App. 180, 186, 627 A.2d 555 (1993) (describing second degree murder as "the baseline from which everything proceeds up or down").

■ At the request of a party, the trial court must "instruct the jury as to the applicable law. . . ." Md.Rule 4–325(c). The requirements of this rule are mandatory. When a requested instruction correctly states a point of law that is relevant to the facts of a case, the failure to give that instruction is error, unless the point has been fairly covered by the instructions actually given. *Binnie v. State*, 321 Md. 572, 581–83, 583 A.2d 1037 (1991).

----

impaired as a result of mental incapacity, mental disorder or emotional disturbance. *See* Md.Ann.Code art. 27, § 413(g)(4) (1992 Repl.Vol. & Supp.1994).

In *Evans v. State*, 28 Md.App. 640, 679–80, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976), we noted that there are good reasons for avoiding the statement that "[a]ll murder will be presumed to be murder in the second degree." As Judge Moylan explained, such a statement "is simply a circuitous and roundabout way of saying that the burden is on the State of proving beyond a reasonable doubt all elements that go to make up murder in the first degree." *Id.* at 679, 349 A.2d 300.

In the case at hand, the relevant point was fairly covered by the instructions given. With regard to first degree murder of the premeditated type, the trial judge properly instructed the jury that the killing must be wilful, deliberate, and premeditated. With regard to second degree murder, the court's instructions included the following:

> Now, second degree murder does not require premeditation or deliberation. It is a lesser offense. More needs to be proven, as I explained to you with first degree murder, than needs to be proven with second degree murder. The State has the higher burden of proof. . . . In order to convict Miss Brooks of second degree murder the State must prove that the conduct of Miss Brooks caused the death of Miss Kobik; and Number 2, that Miss Brooks engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

It is clear from the court's instructions that appellant could not be convicted of premeditated first degree murder unless the State proved that the killing was wilful, deliberate, and premeditated. It is equally clear that a conviction for second degree murder does not require deliberation or premeditation.

■ In arguing that the point at issue was not fairly covered, appellant asserts that the court's instructions failed to convey that the State must overcome a "presumption" in favor of second degree murder. We disagree. In addition to the instructions quoted above, the judge further instructed the jury:

> The Defendant is presumed to be innocent of the charges. The presumption remains with the defendant, Miss Brooks, throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt and to a moral certainty that she is guilty.

Jury instructions must be viewed as a whole, and not in isolation. *See Jones v. State,* 310 Md. 569, 589–90, 530 A.2d 743 (1987), *vacated on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988). When the instructions given here are read as a whole, it is clear that the State must prove every element of the offense beyond a reasonable doubt. Appellant's requested instruction regarding the "presumption" for second degree murder would have added nothing to the court's instructions regarding the prosecution's burden of proof. Indeed, appellant's instruction might have confused the jury, and led them to believe that the State need not prove the elements of second degree murder beyond a reasonable doubt. The trial court did not err in refusing to give the requested instruction.

## II

As we noted above, appellant's conviction for first degree murder was based solely on felony murder. *See* art. 27, § 410 (stating that murder "committed in the perpetration of, or attempt to perpetrate" certain felonies, "shall be murder in the first degree"). During the sentencing phase, the only aggravating factor found by the court was the fact that the murder was committed during the course of a robbery. *See* art. 27, § 413(d)(10). Appellant contends that "[t]he duplicate consideration of the underlying felony in both the guilt/innocence and sentencing phases of the appellant's trial" does not genuinely narrow the class of death-eligible defendants, and is contrary to the Eighth Amendment prohibition against cruel and unusual punishment.[2]

---

**2.** Appellant also contends that duplicate consideration of the underlying felony offends Articles 16 and 25 of the Maryland Declaration of Rights. Because those articles are *in pari materia* with the Eighth Amendment,

Because appellant has not been sentenced to death, she may not properly assert that her own right to be free from cruel and unusual punishment has been violated. In effect, appellant contends that her entire sentencing proceeding was tainted because the judge improperly concluded that she was death-eligible. She explains:

Had the appellant not been subjected to the death penalty, she would have had a greater chance of receiving a sentence of life imprisonment, instead of the harsher sentence of imprisonment for life without the possibility of parole.... If a sentence for death were not a possibility, life without parole would not have been a middle ground between two other options; it would have been the maximum allowable penalty. Life without parole would not, therefore, have represented a compromise for a sentencer who was torn between the two poles.

The issue raised by appellant requires us to consider the constitutional validity of Maryland's capital sentencing scheme, as applied to the circumstances of this case.

The State contends that appellant's argument "is doomed under controlling precedent." We disagree. The cases cited by the State are not controlling here. In *Stebbing v. State,* 299 Md. 331, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), the defendant's conviction for first degree murder was based solely on felony murder. *Id.* at 343, 473 A.2d 903. On appeal, Stebbing argued that "where the homicide is first degree murder solely because of the felony murder rule, none of the underlying felonies may be used as aggravating factors in the capital sentencing phase." *Id.* at 358, 473 A.2d 903. For support, she cited *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980). Judge Rodowsky, writing for the Court, explained that the holding in *Cherry* "seems to be premised either on an interpretation of the North Carolina capital sentencing statute ... or on a North Carolina rule of

we need not discuss them separately. *See Harris v. State,* 312 Md. 225, 237 n. 5, 539 A.2d 637 (1988).

merger." *Id.* 299 Md. at 359, 473 A.2d 903. The Court expressly noted that Stebbing "does not argue that the *Cherry* rule is of constitutional dimension...." *Id.* The Court then concluded that a sentence of death for felony murder was consistent with the legislative intent underlying Maryland's capital punishment statutes, and that Stebbing's convictions did not present a merger problem. *Id.* at 359–60, 473 A.2d 903. *See also Harris v. State,* 303 Md. 685, 710–11, 496 A.2d 1074 (1985); *White v. State,* 300 Md. 719, 741, 481 A.2d 201 (1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985). The decision in *Grandison v. State,* 305 Md. 685, 748–49, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986) applied a similar analysis to a case involving murder for hire.

The state relies heavily on *Calhoun v. State,* 297 Md. 563, 624–29, 468 A.2d 45 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), in which the Court of Appeals concluded that art. 27, § 413(d)(10) was "a constitutional aggravating factor," and was neither overbroad nor disproportionate. *See also Thomas v. State,* 301 Md. 294, 340, 483 A.2d 6 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985) (reaching a similar conclusion). Both *Calhoun* and *Thomas* involved defendants who were convicted of first degree *premeditated* murder committed during the course of a felony. The cases, therefore, may be distinguished from the case at hand, i.e., neither involved a situation where the aggravating factor merely duplicated an element of the underlying murder conviction.

On its face, *Colvin v. State,* 299 Md. 88, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984) appears to raise the issue presented here. Colvin argued that the death penalty statute was unconstitutional, "as applied in the instant case, because a death penalty may not be imposed on a felony murder theory when the defendant's conviction was based on the same evidence of felony murder." *Id.* at 127, 472 A.2d 953. In effect, Colvin argued that the *Cherry* rule was of constitutional dimensions. *Compare Stebbing,* 299 Md. at 359, 473 A.2d 903. He also asserted that the imposi-

tion of the death penalty for felony murder was "excessive" and "disproportionate." *Id.* 299 Md. at 124, 472 A.2d 953. Like the defendants in *Calhoun* and *Thomas,* however, Colvin had also been convicted of premeditated murder. In affirming Colvin's sentence, the Court of Appeals noted that the constitutional issues were not presented by the facts of the case. *Id.* at 124, 128, 472 A.2d 953. The case *sub judice* requires, at last, that these issues be addressed.

The felony murder doctrine is a common law rule that defines "murder" to include any homicide committed during the perpetration, or attempted perpetration, of a felony. *See Evans,* 28 Md.App. at 686 n. 23, 349 A.2d 300. In a sense, the term "felony murder" is something of a misnomer, "felony homicide" would be more apt. At common law, the term "murder" had the well-defined meaning of killing with "malice aforethought." *Wood v. State,* 191 Md. 658, 666, 62 A.2d 576 (1948). The malice required for a felony murder conviction is the specific intent to commit the underlying felony. *See Bruce v. State,* 317 Md. 642, 645, 566 A.2d 103 (1989). As Judge Moylan explained in *Evans,* 28 Md.App. at 684–86, 349 A.2d 300:

> The other forms of first degree murder, albeit perhaps less common, are not mere pale reflections of wilful, deliberate and premeditated killing. They stand upon their own feet as self-sufficient definitions of murder in the first degree. Their own sets of circumstances do not constitute first-degree murder because wilfulness, deliberation and premeditation may somehow be inferred, presumed or implied, but because such wilfulness, deliberation and premeditation are irrelevant considerations and are flatly superfluous.... In most of these other forms of first degree murder, it is the particular *actus reus,* the dreaded modality or means of murder, which we have singled out for our gravest criminal sanction and not a particular *mens rea.*

(footnotes omitted). By virtue of MD.ANN.CODE, art. 27, § 410, a felony murder committed in the course of certain enumerated felonies (including robbery) is murder in the first degree,

notwithstanding the fact that the killing may have been reckless or merely accidental.[3] *See Stansbury v. State,* 218 Md. 255, 260, 146 A.2d 17 (1958) (explaining that § 410 does not create a new crime, but merely classifies felony murders into two degrees for the purpose of sentencing).

█ Both courts and commentators have criticized the felony murder rule for its bootstrapping effect:

> [The rule] vaults a defendant into the class of murderers without the malice finding usually required, and then, still without any culpability finding, elevates what otherwise might not even be murder to first degree murder. In pure felony murder states, a third level of bootstrapping arises as the felony murder defendant is moved up into the supposedly restricted class of defendants eligible for death.

Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 B.C.L.Rev. 1103, 1127 (1990). Maryland is among those states in which a defendant convicted of felony murder may be sentenced to death without any specific finding regarding the *mens rea* that accompanied the killing. Appellant contends that this bootstrapping effect violates the Eighth Amendment to the United States constitution, as well as corresponding sections of the Maryland Declaration of Rights (Articles 16 and 25).

█ In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court instituted a sea change in death penalty jurisprudence. A fair statement of the consensus expressed by the plurality in *Furman* is that "where discretion is afforded a sentencing

---

**3.** Article 27, § 410 provides:

> All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, kidnapping as defined in §§ 337 and 338 of this article, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City Detention Center, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree.

body on a matter so grave as the determination of whether a life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (Stewart J., joined by Powell and Stevens, JJ.). To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared with others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983). Under the capital sentencing laws of most states, including the Maryland statute at issue here, the sentencing authority is required to find at least one aggravating circumstance before it may impose death.[4] *See Gregg,*

---

**4.** In Maryland, the aggravating factors are set forth in art. 27, § 413(d):

(1) The victim was a law enforcement officer who was murdered while in the performance of his duties.

(2) The defendant committed the murder at a time when he was confined in any correctional institution.

(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer.

(4) The victim was taken or attempted to be taken in the course of a kidnapping or abduction or an attempt to kidnap or abduct.

(5) The victim was a child abducted in violation of § 2 of this article.

(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder.

(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

(8) At the time of the murder, the defendant was under sentence of death or imprisonment for life.

(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident.

(10) The defendant committed the murder while committing or attempting to commit a carjacking, armed carjacking, robbery, arson in the first degree, rape or sexual offense in the first degree.

If the court or the jury does not find, beyond a reasonable doubt, that one or more aggravating circumstances exists, a sentence of death may not be imposed. Art. 27, § 413(f). If one or more aggravating circum-

428 U.S. at 162–67, 96 S.Ct. at 2920–22 (reviewing Georgia sentencing scheme); *Proffitt v. Florida*, 428 U.S. 242, 247–51, 96 S.Ct. 2960, 2964–66, 49 L.Ed.2d 913 (1976) (reviewing Florida sentencing scheme). By doing so, the sentencing authority narrows the class of persons eligible for the death penalty according to an objective legislative definition. *See Zant*, 462 U.S. at 878–79, 103 S.Ct. at 2743–44. The legislature must provide "clear and objective standards," so that the sentencing authority is given "specific and detailed guidance," and the process of imposing the death penalty is "rationally reviewable" on appeal. *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980) (holding that an aggravating circumstance in the Georgia death penalty statute was unconstitutionally vague).

Appellant contends, in part, that the use of felony murder as an aggravating factor is unconstitutional under the facts of this case because it merely duplicates the elements of the felony murder conviction. The United States Supreme Court has expressly rejected that argument. In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the defendant was convicted under a statute which narrowly defined five categories of first degree murder. *Id.* at 241–42, 108 S.Ct. at 553. The petitioner was found guilty under a provision of the statute which provided that first degree murder includes "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." *Id.* (citing La.Rev.Stat. Ann. § 14:30.A.(3) (West 1986)). The sole aggravating circumstance found by the jury was that "the offender knowingly created a risk of death or great bodily harm to more than one person." *Id.* at 243, 108 S.Ct. at 554 (citing La.Code Crim. Proc.Ann., Art. 905.4(d) (West 1984)). The Supreme Court observed:

stances are found, the sentencing authority then must consider any mitigating circumstances. § 413(g). The death penalty may not be imposed unless the court or the jury determines, by a preponderance of the evidence, that the aggravating circumstances outweigh the mitigating circumstances. § 413(h)(2).

The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this function may not be performed by jury findings *at either the sentencing phase of the trial or the guilt phase.*

*Id.* at 244–45, 108 S.Ct. at 554 (emphasis added). Because Louisiana's statutory definition of first degree murder adequately narrowed the class of death-eligible persons at the guilt phase of the proceedings, the Court held that the sentencing scheme was constitutionally valid, despite the fact that certain aggravating circumstances duplicated the elements of first degree murder. The Court concluded:

There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more.

*Id.* at 246, 108 S.Ct. at 555. *See also Jurek v. Texas,* 428 U.S. 262, 270–71, 96 S.Ct. 2950, 2955–56, 49 L.Ed.2d 929 (1976) (reaching a similar conclusion regarding the Texas death penalty statute).

Notwithstanding *Lowenfield* and *Jurek,* the courts of at least two states have ruled that duplicate consideration of the underlying felony at both the guilt and sentencing phases does not narrow adequately the class of death-eligible murderers.[5] In *Engberg v. Meyer,* 820 P.2d 70 (Wyo.1991), the defendant was convicted of first degree felony murder under a statutory definition similar to article 27, § 410. *Id.* at 87. The jury found five aggravating circumstances, including: (1) that the murder was committed while the defendant was engaged in the commission of a robbery, and (2) that the murder was

---

5. The Eighth Circuit also reached that conclusion in *Collins v. Lockhart,* 754 F.2d 258, 264 (8th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). *Collins,* however, was decided before the Supreme Court's decision in *Lowenfield,* 484 U.S. 231, 108 S.Ct. 546. In *Perry v. Lockhart,* 871 F.2d 1384, 1392–93 (8th Cir.1989), the Eighth Circuit held that *Collins* was overruled by *Lowenfield.*

committed for "pecuniary gain." *Id.* at 88–89. The Supreme Court of Wyoming concluded:

> This statute provided no requirements beyond the crime of felony murder itself to narrow and appropriately select those to be sentenced to death and therefore, on its face, permitted arbitrary imposition of the death penalty. . . . *All* felony murders involving robbery, by definition, contain at least the two aggravating circumstances detailed above. This places the felony murder defendant in a worse position than the defendant convicted of premeditated murder, simply because his crime was committed in conjunction with another felony.

*Id.* The court distinguished *Lowenfield*, 484 U.S. 231, 108 S.Ct. 546, on the ground that the Wyoming statute clearly provided for narrowing only at the sentencing phase of the proceedings. *Id.* at 90–91. Finally, the court concluded that another "compelling" reason for reversing Engberg's death sentence was that the Wyoming legislature had subsequently amended its death penalty statute. *Id.* The amended statute corrected the constitutional problems previously found by the court.

In *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn.1992), *cert. granted, Tennessee v. Middlebrooks*, —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 466, *cert. dismissed as improvidently granted*, —— U.S. ——, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993), the Supreme Court of Tennessee also reviewed a capital sentencing scheme that duplicated the elements of felony murder at both the guilt and sentencing phases. *Id.* at 341–47. When a defendant has been convicted of first degree murder solely on the basis of felony murder, the court concluded, the use of felony murder as an aggravating factor is unconstitutional under both the Eighth Amendment and the Tennessee state constitution. *Id.* at 346. As in *Engberg*, the Tennessee court held that the felony murder rule did not adequately narrow the class of death-eligible defendants at either the guilt or the sentencing phase of the trial. Citing *Gregg*, 428 U.S. 153, 96 S.Ct. 2909, the court concluded that a "proper" narrowing device must ensure that those who receive

the death penalty will be "among the worst murderers—those whose crimes are particularly serious, or for which the death penalty is peculiarly appropriate." *Id.* at 343. Applying that principle to the issue presented here, the court explained:

> The only defendants who are eliminated by the felony murder narrowing device are those who kill with premeditation and deliberation—i.e., in cold blood—but not during the course of a felony. A simple felony murder unaccompanied by any other aggravating factor is not worse than a simple, premeditated, and deliberate murder. If anything, the latter, which by definition involves a killing in cold blood, involves more culpability.

*Middlebrooks,* 840 S.W.2d at 345. The Tennessee court concluded that *Lowenfield* was inapposite because "Tennessee has a broad definition of murder and has not narrowed in the definitional stage." *Id.* at 346. The court also held, however, that the imposition of death for a felony murder conviction was not unconstitutional *per se,* so long as some aggravating circumstance other than the underlying felony was found. *Id.* at 340–41.

After reviewing both *Lowenfield,* 484 U.S. 231, 108 S.Ct. 546, and *Zant,* 462 U.S. 862, 103 S.Ct. 2733, we conclude that the Tennessee and Wyoming courts have misconstrued the requirements for a constitutionally valid narrowing device. In *Lowenfield,* 484 U.S. at 244–45, 108 S.Ct. at 554, the Supreme Court noted that the use of aggravating circumstances "is not an end in itself," and concluded that the narrowing function may be performed "by jury findings at either the sentencing phase of the trial or the guilt phase." We think the Court intended to suggest that the narrowing function could be performed at *both* the guilt and sentencing phases, and that the capital sentencing scheme must be reviewed in its entirety to determine whether the necessary narrowing has occurred. In *Proffitt,* 428 U.S. 242, 96 S.Ct. 2960, the Supreme Court observed:

> As in *Gregg,* we examine the claims of vagueness and overbreadth in the statutory criteria only insofar as it is

necessary to determine whether there is a substantial risk that the Florida capital-sentencing scheme, *when viewed in its entirety*, will result in the capricious or arbitrary imposition of the death penalty.

*Id.* at 254 n. 11, 96 S.Ct. at 2967 n. 11 (emphasis added). We review our capital sentencing scheme accordingly.

In Maryland, the class of death-eligible felony murderers is narrowed in three distinct ways. The first level of narrowing occurs at the guilt/innocence phase. A conviction for first degree felony murder is limited to a killing that occurs during the following felonies: "rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, kidnapping," and escape from any jail or correctional institution. Art. 27, § 410. Murders committed during the course of arson (§ 408) or in the burning of a storehouse (§ 409) also constitute first degree murder. A defendant who commits an unpremeditated homicide during the course of any other felony is excluded *per se* from the class of death-eligible defendants, even when the homicide was committed with a specific intent to kill, and the defendant also has been convicted of second degree murder.[6]

The second level of narrowing occurs at the sentencing phase, where different types of first degree felony murders are treated in two distinct ways. For certain first degree felony murders, the felony itself will constitute an aggravating circumstance. *See* art. 27, § 413(d)(3) (escape); § 413(d)(4) (kidnapping); § 413(d)(10) (carjacking, armed carjacking, robbery, arson, rape, and sexual offense in the first degree).

---

6. The felonies that are not within in the definition of first degree felony murder include: art. 27, § 2 (forcible abduction of child under 12); § 35C (causing abuse to child); § 119 (dynamiting property); § 139B (possession, assembly, transport, etc. of destructive explosive devices); § 451 (poisoning or contaminating water, drink, food or food products); § 464B (third degree sexual offense). Section 35C (causing abuse to child) specifically provides for a sentence of not more than 20 years in cases where the violation results in the death of the victim. Art. 27, § 35C(b)(2).

Persons convicted of first degree felony murder during the perpetration of other offenses will not be death-eligible unless some additional aggravating circumstance is present.[7]

The third level of narrowing also occurs at the sentencing phase. Pursuant to art. 27, § 413(e)(1), a person convicted of first degree felony murder may not be sentenced to death unless that person was a principal in the first degree. *See Booth v. State*, 327 Md. 142, 186, 608 A.2d 162, *cert. denied*, —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992). *See also Colvin*, 299 Md. at 124, 472 A.2d 953 (noting that the statute provides an exception for contract murder). Thus, Maryland is among a minority of states that refuse to impose the death penalty on defendants who did not actually kill. *See Tison v. Arizona*, 481 U.S. 137, 152–55, 107 S.Ct. 1676, 1685–87, 95 L.Ed.2d 127 (1987) (reviewing statutes that allow the imposition of the death penalty for an accomplice to felony murder). *See also Enmund v. Florida*, 458 U.S. 782, 789–93, 102 S.Ct. 3368, 3372–74, 73 L.Ed.2d 1140 (1982).

When we read our capital sentencing scheme in its entirety, we conclude that the statute genuinely narrows the class of death-eligible felony murder defendants. The statute provides clear, objective guidelines by which the sentencing authority may consider the particular circumstances of the individual offense and offender. *See Gregg*, 428 U.S. at 206, 96 S.Ct. at 2940 (Stewart, J., joined by Powell and Stevens, JJ.). That conclusion, however, does not end our inquiry. We must also consider whether the capital sentencing scheme "reasonably justif[ies] the imposition of a more severe sentence on the defendant compared with others found guilty of murder," *Zant*, 462 U.S. at 877, 103 S.Ct. at 2742.

As we noted earlier, the imposition of the death penalty for felony murder has been criticized, in part, because the penalty may be imposed without proof of any particular *mens rea*. In

---

**7.** The other offenses are: sodomy, mayhem, burglary in the first, second or third degree, and sexual offense in the second degree. *Compare* § 410 (defining first degree felony murder) with § 413(d) (listing aggravating circumstances).

*Middlebrooks*, 840 S.W.2d 317, the Supreme Court of Tennessee observed:

> A simple felony murder unaccompanied by any other aggravating factor is not worse than a simple, premeditated, and deliberate murder. If anything, the latter, which by definition involves a killing in cold blood, involves more culpability.

*Id.* at 345. In his thoughtful article on felony murder and the Eighth Amendment, Professor Rosen explained:

> [T]he felony murder rule thrusts an entire undifferentiated mass of defendants into the category of the supposedly worst murderers eligible for the death penalty. Some of these defendants indeed may be among the most culpable offenders—for example, the cold-blooded executioner of a store clerk during a robbery—but many are not. The rule makes no distinctions.
>
> The felony murder rule disregards the normal rules of criminal culpability and provides homicide liability equally for both the deliberate rapist/killer and the robber whose victim dies of a heart attack....

Rosen, 31 B.C.L.Rev. at 1115 (footnotes omitted). In the case at hand, the trial judge expressed similar concerns:

> This is one of the most troublesome areas of Maryland's death penalty law to me because I can walk over to Mr. Dixon and I can say to him, Mr. Dixon, I hate you. I hate you so bad that I want your family to suffer. I want to do everything I humanly possibly can to bring the greatest possible grief to your family ... I can kill him.... I can mutilate him to death. And under Maryland law I cannot be prosecuted and receive the death penalty.
>
> \*      \*      \*      \*      \*      \*
>
> But if in fact I say to him that I want his sixty-nine dollar watch and I'm going to take that watch and in the course of the murder steal his watch and murder him, I can be prosecuted for the death penalty....
>
> \*      \*      \*      \*      \*      \*

So all the premeditation in the world, all the evil and depraved intent, anything that I wish to do and feel does not subject me in Maryland to the death penalty. But a sixty-nine dollar Pulsar or Seiko watch does.

We share Judge Fader's concern. Our decision, however, must be controlled by judicial precedent rather than personal conscience. In many of the death penalty cases decided since *Furman,* the Supreme Court has suggested that death may be imposed on the principal in a felony murder case without regard to *mens rea.* In *Tison,* 481 U.S. at 146–50, 107 S.Ct. at 1682–84, the Supreme Court reviewed its earlier decision in *Enmund,* 458 U.S. 782, 102 S.Ct. 3368. The Court concluded:

> *Enmund* explicitly dealt with two distinct subsets of all felony murders..... At one pole was Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have any culpable mental state.... The Court held that capital punishment was disproportional in these cases. *Enmund* also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill. The Court clearly held that the small minority of jurisdictions that limit the death penalty to these circumstances could continue to exact it in accordance with local law when the circumstances warranted.

*Id.* 481 U.S. at 149–50, 107 S.Ct. at 1684 (emphasis added). In *Proffitt,* 428 U.S. 242, 96 S.Ct. 2960, the Court upheld a Florida capital sentencing scheme in which the definition of "capital felony" included a killing committed in the perpetration of certain felonies. *Id.* at 247 n. 4, 96 S.Ct. at 2964 n. 4. The Florida law duplicated those felonies as one of the aggravating factors. *Id.* at 251, 96 S.Ct. at 2966. The Court concluded that "on their face these procedures ... appear to meet the constitutional deficiencies identified in *Furman.*" *Id.* at 251, 96 S.Ct. at 2966. (Stewart, J., joined by Powell and Stevens, JJ.). In *Colvin,* 299 Md. at 124–25, 472 A.2d 953, the Court of Appeals has likewise suggested that "the imposition of a sentence of death in a felony murder case is not necessari-

ly excessive and unconstitutional," notwithstanding the lack of any specific finding regarding *mens rea.*

■ Because *Proffitt, Tison,* and *Colvin* did not squarely address the issue presented here, we do not regard those cases as controlling precedent. Nonetheless, we find them persuasive. As Eighth Amendment jurisprudence now stands, the question of whether a conviction for felony murder reasonably justifies the imposition of the death penalty is a public policy judgment to be made by the Maryland legislature, as representatives of the people of Maryland.

■ Finally, we must consider whether the procedures followed in felony murder cases create a "substantial risk" that death will be inflicted in an "arbitrary and capricious manner." *Gregg,* 428 U.S. at 188, 96 S.Ct. at 2932 (Stewart, J., joined by Powell and Stevens, JJ.). It is true, as both courts and commentators have suggested, that the felony murder rule creates a risk of imposing the death penalty for a killing that was truly accidental. The facts of *Stewart v. State,* 65 Md.App. 372, 500 A.2d 676 (1985), *cert. denied,* 305 Md. 599, 505 A.2d 856 (1986), provide a textbook example. In *Stewart,* two men entered a motel lobby and demanded money from a sixty-year-old desk clerk. The clerk told police that she did not see a weapon. Two hours after the robbery, the clerk died of an adrenaline-induced heart attack, and a jury found the defendant guilty of felony murder. On appeal, we concluded that the evidence was sufficient to sustain the jury's finding that the fright or shock of the robbery had caused the clerk's heart failure. *Id.* at 386, 500 A.2d 676. Under the present capital sentencing scheme, Stewart could be sentenced to death.

In light of *Stewart,* we think it fair to say that the statute creates some risk that the death penalty will be imposed in an arbitrary and capricious manner. We do not regard the risk as "substantial." Under art. 27, § 413(g)(8), the mitigating circumstances may include "any other facts that the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." When the defendant is

convicted on first degree felony murder, but acquitted of other homicide charges, the mitigating circumstances must include the fact of the acquittal, as well as any conclusions about the defendant's mental state that necessarily follow from the acquittal. In the case at hand, appellant was acquitted on premeditated first degree and second degree murder charges. From the fact of the acquittal, plus the presumption of innocence, it necessarily follows that:

1) the killing was not premeditated; or

2) the killing was not committed with a specific intent to kill or inflict grievous bodily harm.[8]

Where appropriate, the sentencing authority must include these conclusions among the mitigating circumstances.[9]

In the event that a defendant is sentenced to death for an accidental felony murder despite these mitigating circumstances, the statute provides a final safeguard. Pursuant to art. 27, § 414, the defendant is entitled to automatic review of the death sentence by the Court of Appeals. In reviewing the sentence, the Court shall determine, *inter alia*, whether the evidence supports the conclusion that the aggravating circumstances outweigh the mitigating circumstances, § 414(e)(3), and whether the sentence was imposed "under the influence of passion, prejudice, or *any other arbitrary factor*." § 414(e)(1)

---

8. In the case at bar, the jury apparently was not instructed on the "depraved-heart" variety of second degree murder. *See Robinson v. State,* 307 Md. 738, 744–46, 517 A.2d 94 (1986) (explaining that second degree murder also includes a homicide committed "under circumstances manifesting an extreme indifference to the value of human life").

9. In considering the mitigating circumstances, the sentencing judge noted:

> I will add a factor myself. Number 1, not as a legal matter, but as a factual matter, that there was no premeditation. I check off yes, that I find that as a factor. I am compelled to do so. The jury determined that it was so.

The sentencing judge did not consider the factual conclusions which necessarily follow from the acquittal for second degree murder. Because appellant was not sentenced to death, the error is obviously harmless.

(emphasis added). We conclude that these safeguards are constitutionally adequate.

As we noted at the outset, appellant has not been sentenced to death, and the imposition of the death penalty under the particular circumstances of her case is not at issue. Rather, the question presented requires that we decide whether the imposition of death for first degree felony murder is unconstitutional *per se*, when the underlying felony itself is the only aggravating factor. Because Maryland's capital sentencing scheme genuinely narrows the class of felony murder defendants who are death-eligible, we conclude that the use of the underlying felony as an aggravating factor does not offend the Eighth Amendment prohibition against cruel and unusual punishment. Accordingly, the trial court did not err when it concluded that appellant was death-eligible.

## III

Appellant next contends that a new sentencing proceeding is required because her waiver of the statutory right to jury sentencing was not knowing and intelligent. Specifically, appellant argues that the court erred by failing to advise her clearly that the judge has the discretion to suspend all or part of a "simple" life sentence imposed by the jury.

A defendant has no constitutional right to sentencing by a jury in a capital case. *Bruce v. State,* 328 Md. 594, 602, 616 A.2d 392 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993). Pursuant to MD.ANN.CODE art. 27, § 413(b)(3) (1992 Repl.Vol. & Supp.1994), a defendant convicted of first degree murder shall be sentenced by a jury unless "a jury sentencing proceeding is waived by the defendant." The waiver will not be effective unless it is both knowing and voluntary. *Bruce,* 328 Md. at 603, 616 A.2d 392; *Trimble v. State,* 321 Md. 248, 262, 582 A.2d 794 (1990). A defendant who does not actively waive the right to a jury sentencing will automatically receive one.

In *Harris v. State,* 295 Md. 329, 338–40, 455 A.2d 979 (1983), the defendant argued that the trial judge erred by failing to

advise him properly that the jury's failure to reach a unanimous verdict within a reasonable time would result in a sentence of life imprisonment. The Court of Appeals held that the omission of this information rendered the waiver ineffective, and remanded the case for a new sentencing proceeding. A similar issue was raised in *Trimble*, 321 Md. at 260–264, 582 A.2d 794, and the Court of Appeals again concluded that remand was required, despite the fact that Trimble failed to raise the issue earlier. The Court concluded that the failure to raise an issue on direct appeal is not fatal to further review if the issue involves a right "which cannot be waived absent intentional and knowing action by the defendant." *Id.* at 264, 582 A.2d 794.

In the case before us, the judge advised appellant regarding the capital sentencing procedure and her right to jury sentencing. The judge explained the mitigating factors that defense counsel intended to argue during sentencing, which included:

... Number 3, the existence of an appropriate alternative sentence, meaning life without parole or life, or the fact of the matter is that if it is a judge trial it can even be life and suspended in part. *And probably as a jury trial also.* I think the law is that if it is a jury trial nobody—nobody has made a decision on that. But if it is just straight life, then a judge could suspend straight life.

(emphasis added). The judge further advised appellant:

THE COURT: Do you also understand that I could not, if it was a jury sentencing, change a sentence of death.

THE DEFENDANT: Yes, sir.

THE COURT: I could not, if it is a jury sentence, change a sentence of life without parole.

THE DEFENDANT: Yes, sir.

THE COURT: *And there is a question as to whether or not I could change a life sentence.* But in no case would I ever be able to do anything less than 25 years; do you understand that?

THE DEFENDANT: Yes, sir.

(emphasis added). Appellant contends that the court's statements were erroneous because the judge could, in fact, suspend a life sentence imposed by the jury. In support of that argument she refers us to *Taylor v. State*, 333 Md. 229, 634 A.2d 1322 (1993), wherein the Court of Appeals explained:

> It is also within the discretion of the judge to suspend all or part of a sentence of life imprisonment pursuant to Md.Code (1957, 1992 Repl.Vol.) Article 27, § 641A, unless the power of the trial court to do so is limited by some other provision of law.

*Id.* at 234, 634 A.2d 1322 (footnote omitted). *See also Williamson v. State*, 284 Md. 212, 214, 395 A.2d 496 (1979); *State v. Wooten*, 277 Md. 114, 117, 352 A.2d 829 (1976).

As we noted above, the trial judge stated that he "probably" could suspend a sentence of life imposed by a jury, but that "nobody has made a decision on that." A more accurate statement would have paraphrased the language of *Taylor*, 333 Md. at 234, 634 A.2d 1322, by noting that the judge *could* suspend a jury's straight life sentence unless prohibited by some other provision of law. Although it appears that no other provision of law is applicable here, we decline to vacate the sentence.

The Court of Appeals has frequently stated that an ambiguous statement made by the court or defense counsel during the waiver inquiry will not provide a basis for appellate relief absent some clear indication that the defendant was misled by the ambiguity. *See Thanos v. State*, 330 Md. 77, 90–92, 622 A.2d 727 (1993). In *Gilliam v. State*, 320 Md. 637, 579 A.2d 744 (1990), *cert. denied*, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), the defendant argued that he did not knowingly and intelligently waive his right to testify. In evaluating that claim, the Court of Appeals held that there is a rebuttable presumption that criminal defendants represented by counsel have been properly informed of their rights. *Id.* at 652, 579 A.2d 744. The Court found nothing in the record to suggest that Gilliam was not fully informed by counsel, and his

sentence was affirmed. *See also Thanos*, 330 Md. at 91, 622 A.2d 727.

A similar principle has been applied to ambiguous statements made by the court. In *Morales v. State*, 325 Md. 330, 600 A.2d 851 (1992), an unrepresented defendant was convicted on drug-related charges. At the close of the State's case, the trial judge advised the defendant of his right to testify or to remain silent. Initially, Morales intended to testify. However, the trial court repeatedly warned him, "if you take the stand and testify and you have been convicted of a crime before, they may ask you, they meaning the State may ask you about that." *Id.* at 334, 600 A.2d 851. Morales then changed his mind. In fact, Morales had several prior convictions that would not have been admissible. The Court of Appeals concluded:

> Since Morales apparently changed his decision to testify based on the trial court's incorrect implication that all of his prior convictions could be used to impeach him, the defendant's decision to waive his constitutional right to testify and to exercise his constitutional right to remain silent was not knowingly and intelligently waived.

*Id.* at 339, 600 A.2d 851. In *Oken v. State*, 327 Md. 628, 636–42, 612 A.2d 258 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993), the Court of Appeals reviewed a similar situation. Citing *Morales*, the Court declined to reverse the lower court because it found no clear indication that the trial court's ambiguous remarks had an influence on Oken's decision not to testify. *Id.* at 641–42, 612 A.2d 258.

In the case at hand, we think the court's remarks were ambiguous rather than overtly mistaken. Accordingly, we must presume that appellant was properly advised by her counsel, and may not vacate the sentence without some clear indication that the court's remarks influenced her decision to waive a jury sentencing. When questioned by the judge, appellant indicated that she had discussed the sentencing procedure with counsel, that she understood what the judge was saying, that she had no questions, and that she was clear

on what she wanted to do. Defense counsel (Ms. Chappell) then questioned appellant further:

MS. CHAPPELL: Dionne, I just want to ask you, you and I have talked about this prior to today, is that right?

THE DEFENDANT: Yes.

MS. CHAPPELL: Would it be fair to say we have talked about it half a dozen to a dozen times?

THE DEFENDANT: Yes.

MS. CHAPPELL: At various times throughout preparation for this case—

THE DEFENDANT: Yes.

MS. CHAPPELL: —in anticipation of a death eligible verdict, is that correct?

THE DEFENDANT: Yes, it is.

MS. CHAPPELL: Do you have any doubt in your mind about what you want to do?

THE DEFENDANT: No.

MS. CHAPPELL: Are you sure you feel prepared to make the decision?

THE DEFENDANT: Positive.

We find no clear indication that the trial court's comments regarding the possible suspension of a life sentence had any effect on appellant's decision to waive her right to jury sentencing. The presumption that appellant was properly advised by counsel has not been rebutted. Under the circumstances, the statements made by the trial court do not constitute sufficient grounds to remand the case for resentencing.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**